**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Fidel LUNA–MADELLAGA,**
**Defendant–Appellant.**

**No. 02–10157.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 6, 2002.

Filed Jan. 15, 2003.

Michael K. Powell, Assistant Federal Public Defender, Reno, NV, for the defendant-appellant.

Ronald C. Rachow, Assistant United States Attorney, Reno, NV, for the plaintiff-appellee.

Before: RYMER, THOMAS and SILVERMAN, Circuit Judges.

Opinion by Judge RYMER; Dissent by Judge THOMAS.

RYMER, Circuit Judge.

Fidel Luna–Madellaga appeals from the 78–month sentence imposed following his guilty plea conviction for unlawful reentry of a deported alien in violation of 8 U.S.C. § 1326(a). The question presented here is whether Luna–Madellaga is subject to the enhanced penalty provided by § 1326(b)(2) for "removal [that] was subsequent to a conviction for commission of an aggravated felony," where the removal that followed such a conviction was accomplished through reinstatement of a prior removal order pursuant to 8 U.S.C. § 1231(a)(5). We join the Fifth Circuit in concluding that the enhancement applies to removal that is pursuant to a reinstated order.[1] Having jurisdiction, we affirm.

## I

Luna–Madellaga was first removed[2] from the United States in August 1995 after being convicted on charges of carrying a concealed weapon. He reentered the country illegally, and was removed in January 1996 by reinstatement of the 1995 removal order pursuant to 8 U.S.C. § 1231(a)(5). Section 1231(a)(5) provides:

> If the Attorney General finds that an alien has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal, the prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed, the alien is not eligible and may not apply for any relief under this chapter, and the alien shall be

removed under the prior order at any time after the reentry.

8 U.S.C. § 1231(a)(5).

After this, he reentered illegally again and was convicted of assault with a deadly weapon in July 1996. The 1995 removal order was reinstated, and Luna–Madellaga was removed in December 1999. He returned yet again. This time Luna–Madellaga was indicted for unlawful reentry of a deported alien in violation of 8 U.S.C. § 1326(a), and pled guilty.

The Presentence Investigation Report recommended an enhanced penalty pursuant to U.S.S.G. § 2L1.2(b)(1)(A) because Luna–Madellaga was previously deported following his 1996 conviction for assault with a deadly weapon. U.S.S.G. § 2L1.2(b)(1)(A) implements 8 U.S.C. §§ 1326(a) and (b)(2) by increasing the base offense level for unlawfully entering the United States by 16 levels when the defendant was previously deported after a conviction for a felony that is a crime of violence.

Luna–Madellaga objected to the recommendation on the basis that the 1996 offense occurred after his original removal order to which his subsequent removals related back because they were based on reinstatements of the original order. The district court overruled the objection and sentenced Luna–Madellaga to 78 months imprisonment pursuant to the enhancement.

He timely appeals.

---

**1.** Another panel reached the same conclusion in a case that was also submitted for decision on December 6, 2002. *United States v. Carrillo–Lopez,* 313 F.3d 1185 (9th Cir.2002) (per curiam).

**2.** The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") eliminated the previous legal distinction between deportation, removal, and exclusion, merging all into a broader category entitled "removal." *See United States v. Lopez–Gonzalez,* 183 F.3d 933, 934–35 (9th Cir.1999).

## II

Luna–Madellaga argues that the only formal order of removal was the original removal order issued in 1995. In his view, this means that his 1996 conviction cannot qualify for enhanced sentencing because it occurred *after* his removal rather than *before*, as § 1326(b)(2) requires. Thus, he maintains, reinstatement of the prior order does not reset the time line for evaluating his 1996 conviction.

Section 1326(a) governs "any alien who (1) has been ... deported, or removed or has departed the United States while an order of exclusion, deportation, or removal is outstanding, and thereafter (2) ... is at any time found in, the United States." If the "removal was subsequent to a conviction for commission of an aggravated felony," the alien may be fined and imprisoned up to twenty years. 8 U.S.C. § 1326(b)(2) (1996).

Section 1326 speaks only of "removal." All that the statute requires is that the alien reenter the United States illegally after having been removed subsequent to an aggravated felony conviction. It plainly turns on the alien's *physical* removal—not the *order* of removal. Similarly, the plain language of § 1231(a)(5) contemplates a second physical removal under a reinstated prior order. As it provides, a reentering alien "shall be removed under the prior order at any time after the reentry." Here, Luna–Madellaga was physically removed twice, once in 1995, and again in 1999.[3] That the 1999 removal was accomplished by reinstatement of his 1995 removal order is of no consequence. Therefore, he is subject to the enhanced penalty prescribed by § 1326(b)(2) and U.S.S.G. § 2L1.2(b)(1)(A).

The Fifth Circuit confronted the same situation, and rejected an argument similar to Luna–Madellaga's, in *United States v. Nava–Perez*, 242 F.3d 277 (5th Cir.2001). Like Luna–Madellaga, Nava–Perez claimed that he was not subject to the Guidelines' enhancement because his second removal pursuant to a reinstated order was effective before he committed the aggravated felony that triggered it. The court of appeals held that § 1231(a)(5) does not treat the alien's removal as effective from its original date; rather, it unambiguously contemplates *a second removal* under the reinstated order. *Id.* at 279. For the same reason, Luna–Madellaga's reinstatement does not relate back to the time of the prior removal order as he contends. Instead, as his 1999 removal was subsequent to his 1996 conviction for assault with a deadly weapon, the U.S.S.G. § 2L1.2(b)(1)(A) enhancement applies.

Luna–Madellaga submits that if this is so, due process concerns are implicated because an individual ordered formally removed is offered significant procedural rights that are unavailable when a prior formal order is simply reinstated. He points out that we questioned the constitutionality of reinstatement proceedings in *Castro–Cortez v. INS*, 239 F.3d 1037, 1048–50 (9th Cir.2001), and suggests that we should resolve these concerns in his favor. However, we have since held that reinstatement of a removal order does not violate due process. *Alvarenga–Villalobos v. Ashcroft*, 271 F.3d 1169, 1174 (9th Cir. 2001). As we explained in *Alvarenga–Villalobos*, an alien who illegally reenters the United States while under an order of removal has already received a full and fair hearing, including judicial review of

---

**3.** While the Presentence Investigation Report describes additional instances of removal, only the 1995 removal and 1999 removal pursuant to reinstatement are relevant for our purposes here.

that hearing, which affords all the process to which he is entitled.

Luna–Madellaga suggests that his situation is different because the government is using events subsequent to the "original date" of his initial removal order to enhance his sentence. This distinction is immaterial, as the enhancement applies because Luna–Madellaga was convicted of a crime of violence before he was removed in 1999.

AFFIRMED.

THOMAS, Circuit Judge, dissenting:

The salient question in this case is whether the word "removal" in 8 U.S.C. § 1326(b)(2) refers to a "removal" as that term is used in immigration law or whether Congress used it in its colloquial sense, namely as a "physical removal." It is not a trivial inquiry, because the answer dictates whether Luna–Madellaga, and others similarly situated will be subject to a tenfold increase in the maximum punishment for the crime at issue. Because the plain language of the statute, its structure, and its legislative history clearly indicate that Congress meant "removal" in its technical sense, I cannot agree with the government's statutory construction. Thus, I must respectfully dissent.

I

"In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988) (citations omitted). "[S]tatutory language must always be read in its proper context." *McCarthy v. Bronson*, 500 U.S. 136, 139, 111 S.Ct. 1737, 114 L.Ed.2d 194 (1991). Thus, some historical perspective is important to the present analysis.

In 1952, Congress criminalized the reentry into the United States by a deported alien. *See* ch. 8, § 276, 66 Stat. 229 (1952) (codified as amended at 8 U.S.C. § 1326 (2002)). The crime was denominated a felony and provided a maximum punishment of two years imprisonment. As part of the Anti–Drug Abuse Act of 1988, Congress added a subsection that provided for fifteen years maximum imprisonment for aliens reentering the United States who had committed aggravated felonies before being deported. Pub.L. No. 100–690, § 7345(a)(2), 102 Stat. 4471 (1988). "Deportation," as that term was used in the immigration statutes at the time, was a term of art that we construed as meaning "being deported according to law." *United States v. Galicia–Gonzalez*, 997 F.2d 602, 603 (9th Cir.1993) (per curiam) (internal citation omitted). In 1994, the maximum term was increased to twenty years. Pub.L. No. 103–322, § 130001(b), 108 Stat. 2023 (1994).

In short, the amendment provided for sharply increased punishment for a conviction under 8 U.S.C. § 1326 "where the reason for the prior deportation was the alien's conviction of an aggravated felony." *United States v. Alfaro–Zayas*, 196 F.3d 1338, 1342 n. 5 (11th Cir.1999) (per curiam). "This strongly suggests a Congressional judgment that the flouting of American immigration laws is a far graver matter where the defendant's prior deportation was for committing a serious crime than where the prior deportation was for a technical violation of the immigration laws." *United States v. Campbell*, 967 F.2d 20, 24 (2d Cir.1992). The structure of the provision supports this construction. In contrast to statutes that impose increased penalties for recidivism, this provision contained a temporal limitation. It enhanced the penalty only if the crime had been committed prior to a deportation.

In 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub.L. No. 104–208, 110 Stat. 3009–546 (Sept. 30, 1996). In doing so, Congress created several new terms of art, one of which was "removal." *Rojas–Reyes v. INS*, 235 F.3d 115, 120 (2d Cir.2000). The creation of the remedy of "removal" eliminated the previous legal distinction between deportation and exclusion proceedings and merged them into one unified procedure. *United States v. Lopez–Gonzalez*, 183 F.3d 933, 934 (9th Cir.1999). As the Supreme Court noted, in considering IIRIRA:

> An additional difference between the old and the new statute with regard to petitions for review is one of nomenclature. In keeping with a statute-wide change in terminology, the new provision refers to orders of "removal" rather than orders of "deportation" or "exclusion."

*Calcano–Martinez v. INS*, 533 U.S. 348, 350 n. 1, 121 S.Ct. 2268, 150 L.Ed.2d 392 (2001).

With the substitution of the new unified remedy of "removal" for the remedies of "exclusion" and "deportation," Congress concomitantly amended the affected statutes defining immigration crimes to reflect the new nomenclature. Section 1326(b)(2) was amended to substitute "removal" for "deportation." No other change was made to the subsection.

In sum, prior to 1996, the meaning of § 1326(b)(2) was fairly clear: If an alien reentered the country after being legally deported for committing an aggravated felony, he was subject to increased punishment. The extent of the 1996 amendments was the substitution of the correct new name of the legal process used to eject aliens from the United States, e.g., replacing the legal remedy of "deportation" with the legal remedy of "removal." Congress did not alter the temporal connection required under the predecessor statute. In order to qualify for sentence enhancement, the aggravated felony had to be committed prior to the removal.

The government now argues that the 1996 amendments accomplished something much more, namely the injection of an entirely new concept into the statute: physical removal. Despite the fact that the 1996 amendments merely substituted words describing the legal process of ejecting an alien from our soil, the government now claims that § 1326(b)(2) has no relation to legal process. Rather, the government contends that a twenty-year sentence may be imposed if an alien returns after being "physically removed" by any means, legal or otherwise. Given the statutory history, this is an obviously strained interpretation of what Congress accomplished in 1996 for several reasons.

First, when Congress uses a term of art that has an accumulated meaning, "it presumably knows and adopts the cluster of ideas that were attached to [the] borrowed word ...." *Molzof v. United States*, 502 U.S. 301, 307, 112 S.Ct. 711, 116 L.Ed.2d 731 (1992) (quoting *Morissette v. United States*, 342 U.S. 246, 263, 72 S.Ct. 240, 96 L.Ed. 288 (1952)). Thus, when Congress used the technical term "removal" as a substitute for the term "deportation" in a section containing technical amendments, one must assume that it knew what it was doing—namely, exchanging terms of art, rather than changing the meaning of a statute by interjecting a colloquial expression. If Congress had intended the word "removal" in § 1326(b)(2) to mean "physical removal," one either would have expected the word—or at least the concept—to have been used in the statute prior to the passage of IIRIRA or for Congress to make explicit reference to its desired change when amending the statute at issue. Neither situation occurred.

Throughout § 1326, "removal" is used as an immigration term of art. Were there any doubt that Congress was employing the word "removal" in its technical sense in the subsection in question, that doubt should be dispelled by the last sentence of § 1326(b), which provides that:

For the purposes of this subsection, the term "removal" includes any agreement in which the alien stipulates to removal during (or not during) a criminal trial under either Federal or State law.

From this, one can only conclude that, in using the term "removal," Congress was not equating all departures as removals; rather, it was speaking in technical, not colloquial, terms.

Second, the government's argument ignores the temporal limitation placed in the statute. Under pre-IIRIRA law and IIRIRA, Congress chose to impose a temporal limitation, namely requiring that the aggravated felony be committed before the deportation or removal. This was not accidental. Indeed, Congress indicated its consciousness of the temporal restrictions in its other amendments to § 1326. In those amendments, Congress added subsection (b)(4) that provides that if an alien is removed pursuant to § 1231(a)(4)(B) (provision allowing for removing an alien before completing his incarceration sentence), particular penalties will apply. The subsection makes clear that the penalties will attach if after removal, the alien "enters, attempts to enter, or is at *any time* found in, the United States...." *Id.* (emphasis added). Penalties under (b)(4) thus attach at *any time that the alien is found* in the United States.

In contrast, penalties under § 1326(b)(2) apply only if the alien is convicted prior to his removal. In short, Congress did not intend § 1326(b)(2) to be a general recidivist enhancement. If Congress had intended this result, it could have easily accomplished it, as it has in many other contexts. The government's construction eviscerates the temporal statutory requirement by allowing the penalty to be imposed regardless of whether the crime was committed prior to or after the order of deportation or removal. This is contrary to the underlying theory of the statute, which is that sharply increased punishment should be imposed for a conviction under § 1326 "where the reason for the prior deportation was the alien's conviction of an aggravated felony." *Alfaro–Zayas,* 196 F.3d at 1342 n. 5.

In sum, a review of the statutory language, structure and history can only lead to the conclusion that Congress did not alter pre-IIRIRA requirements by merely substituting "removal" for "deportation" in § 1326(b)(2). Congress was substituting terms of art, not attaching new penalties to different actions.

## II

In the instant case, the government argues that a "reinstatement" pursuant to 8 U.S.C. § 1231(a)(5) is equivalent to a "removal" under immigration law because the procedures both result in the alien leaving the United States. They are not equivalent, legally or procedurally. Removals occur as a result of a formal process culminating in an order issued by an immigration judge. A reinstatement of a prior order of deportation or removal is an expedited procedure designed to physically remove aliens from the United States and occurs administratively without the alien appearing before an immigration judge.

The government's novel theory was never applied under pre-IIRIRA law, which would have deemed reinstatements of deportations as equivalent to orders of deportations. Under pre-IIRIRA law, reinstatements of prior orders of deportation were governed by 8 U.S.C. § 1252(f) (repealed). It applied to a small class of

aliens who were found in the country after having been deported subsequent to a conviction related to national security threats. *Id.* The provision did not apply to aliens who were ejected from this country pursuant to exclusion orders or orders for voluntary departure. *Id.* The former implementing regulations also provided the alien with a hearing, which was a safeguard eliminated under IIRIRA. *Cf.* 8 C.F.R. § 242.23 (repealed 1997) (providing a hearing) *with* 8 C.F.R. § 241.8 ("The alien has no right to a hearing before an immigration judge in such circumstances ...").

In 1996, IIRIRA overhauled the reinstatement procedure, replacing § 1252(f) with the present statute § 1231(a)(5). The purpose of § 1231(a)(5) is to expedite the removal of *all* aliens who are in the country without permission after previously having been ordered removed. These aliens are provided neither a hearing, counsel, record, an opportunity to provide or contest evidence before an immigration judge nor an appeal or review of such decision. *Cf.* 8 U.S.C. 1229a(a)(1), (a)(4) (setting forth the protections that aliens in removal proceedings are afforded). Instead, an immigration officer has the authority to reinstate any prior removal order to effect an alien's departure from the country. *See* 8 U.S.C. § 1231(a)(5).

The text of § 1231(a)(5) plainly distinguishes reinstatement procedure from removal procedure. It provides:

> If the Attorney General finds that an alien has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal, the prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed, the alien is not eligible and may not apply for any relief under this chapter, and the alien shall be removed under the prior order at any time after the reentry.

Under the statute, there can be no reinstatement, unless there exists a predicate order of removal issued by an immigration judge. The enumeration of the clauses "having been removed" or "having departed voluntarily" indicates that the word "removal" is not intended to include all departures. Indeed, we have held that the term "removal" in § 1231(a)(5) applies only to aliens have been removed under a "predicate order" of deportation or removal. *Gallo–Alvarez v. Ashcroft*, 266 F.3d 1123, 1129 (9th Cir.2001).

As a means of expediting the removal of aliens who entered the country unlawfully, Congress determined that the reinstatement mechanism would replace the time and expense of providing a previously deported alien with a hearing. The reinstatement order thus relies on the previous adjudication and implements the conditions of such order as they existed at the time that the removal order was issued.

Section 1231(a)(5) provides that "the prior order of removal is reinstated from its original date" and that the reinstatement order "is not subject to being reopened or reviewed, the alien is not eligible and may not apply for any relief under this chapter." The government's construction of § 1326 erred by ignoring the clauses "under an order of removal," "from its original date," and "is not subject to being reopened or reviewed," that are set forth in § 1231(a)(5). Such analysis is contrary to the directive that "we avoid any statutory interpretation that renders any section superfluous and does not give effect to all of the words used by Congress." *United States v. Powell*, 6 F.3d 611, 614 (9th Cir. 1993) (internal modification and citation omitted).

When these clauses are taken as a whole, it becomes clear that Congress intended for an alien pursuant to

§ 1231(a)(5) to depart the country by the reinstatement of his or her original removal order. The reinstatement process neither issues an order of removal nor considers new evidence that occurred after the date of that the original order. When an alien departs pursuant to § 1231(a)(5), this departure thus is not under an order of removal, but rather is effected by the reinstatement of an original removal order that was issued previously by an immigration judge.

The former reinstatement provision set forth in § 1252(f) further supports a finding that Congress did not intend for a departure pursuant to a reinstatement procedure to receive the same legal effect conferred to an order of removal. The repealed statute provided that:

> Should the Attorney General find that any alien has unlawfully reentered the United States after having previously departed or been deported pursuant to an order of deportation ... on any [national security related] ground ..., the previous order of deportation shall be deemed to be reinstated from its original date and such alien shall be deported under such previous order at any time subsequent to such reentry. *For the purposes of subsection (e) of this section the date on which the finding is made that such reinstatement is appropriate shall be deemed the date of the final order of deportation.*

8 U.S.C. § 1252(f) (repealed 1996) (emphasis added).

Significantly, the last sentence provided that the date of the reinstated order would be the date of the final order of deportation. When Congress drafted the current reinstatement procedures it deliberately omitted such provision. The most reasonable inference from such omission thus is that Congress did not intend for an alien who is forced to depart the country via reinstatement procedures to have such de-

parture under any circumstances be deemed a prior removal as contemplated under § 1231(a)(5).

Thus, the reinstatement provisions of IIRIRA plainly distinguish between orders of removals and reinstatements of orders of removal.

### III

The significance of all of this lies in the right to due process. "In a criminal prosecution under § 1326, the Due Process Clause of the Fifth Amendment requires a meaningful opportunity for judicial review of the underlying deportation." *United States v. Zarate–Martinez,* 133 F.3d 1194, 1197 (9th Cir.1998) (citing *United States v. Mendoza–Lopez,* 481 U.S. 828, 839, 107 S.Ct. 2148, 95 L.Ed.2d 772 (1987)). As the Supreme Court wrote in *Mendoza–Lopez,* "[i]f a statute envisions that a court may impose a criminal penalty for reentry after *any* deportation, regardless of how violative of the rights of the alien the deportation proceeding may have been, the statute does not comport with the constitutional requirement of due process." 481 U.S. at 837, 107 S.Ct. 2148 (emphasis in original).

In this case, Luna–Madellaga was charged by an indictment, which read as follows:

> On or about May 14, 2001, in the District of Nevada, FIDEL LUNA–MADELLAGA, defendant herein, an alien who had been arrested and deported, removed and/or excluded from the United States on December 7, 1999, after having been previously convicted of a felony offense, was found in the United States willfully being in this country unlawfully; that is, without permission of the Attorney General, all in violation of Title 8 U.S.C. § 1326(a) and (b)(2).

From examination of the indictment, it is obvious that the government did not

charge Luna–Madellaga, either as an element of the offense or for sentencing purposes, with re-entry after his original deportation in 1995, but rather re-entry after the reinstatement of the order of deportation in 1999. Under 8 U.S.C. § 1326(d), the alien is restricted to contesting the deportation or removal proceeding identified only if particular conditions are met. If, as the government claims, a reinstatement is the same as a removal (as is charged in this case), then the alien is limited to challenging the validity of the reinstatement procedure and cannot challenge the underlying deportation or removal order. Thus, the protections that the Supreme Court found important in *Mendoza–Lopez* would be completely eliminated. Under the government's theory, for example, Luna–Madellaga and others similarly situated would be precluded from raising the claims that the defendant successfully raised in *United States v. Ahumada–Aguilar*, 295 F.3d 943 (9th Cir.2002) (reversing conviction under § 1326 because the immigration judge deprived defendant of his statutory right to be represented by counsel at a group deportation hearing). *See id.* at 952.

Under IIRIRA, an alien who is in this country without permission, but has not committed an aggravated felony, is subject to removal and provided a hearing before an immigration judge. An alien without status who has committed an aggravated felony is subject to an expedited removal through a formal process pursuant to 8 U.S.C. § 1228. Under both procedures, the alien may contest the removal in a hearing. In contrast, an alien forced to depart the United States through a reinstatement procedure under § 1231(a)(5) is not necessarily afforded a hearing. The alien simply may be physically ejected.

What the government is attempting to do here is to bypass the formal expedited removal process under § 1228 and the consequences of relying upon the reinstate-

ment procedure under § 1231(a)(5). If an alien who has departed this country under an order of removal returns and commits an aggravated felony, the government has a choice in how to respond. The government can subject the alien to an expedited removal under § 1228 in response to the commission of a crime, in which case it must prove the necessary facts to the satisfaction of an immigration judge. In the alternative, the government may cause the alien's departure by reinstating the prior removal order under § 1231(a)(5) without relying on the intervening crime.

However, if the government chooses reinstatement, then it must bear the consequences of the choice. It cannot take advantage of the truncated reinstatement procedures, which relate back to the original order of removal, then later claim in a subsequent criminal prosecution that the reinstatement was equivalent to a new order of removal under § 1228. Such a construction would allow the government to incarcerate an alien for up to twenty years on charges that were not raised first at a full and fair immigration hearing.

For this reason, *Alvarenga–Villalobos*, 271 F.3d 1169, 1174 (9th Cir.2001), is not relevant to the present inquiry. *Alvarenga–Villalobos* was limited to deciding whether a *non-criminal* reinstatement order violates due process under the particular circumstances at issue. *Alvarenga–Villalobos's* holding is not dispositive of the instant circumstances in light of the fact that deportation and removal are civil remedies. *See Harisiades v. Shaughnessy*, 342 U.S. 580, 594, 72 S.Ct. 512, 96 L.Ed. 586 (1952) (describing deportation as a civil remedy).

In contrast, the government's construction of § 1326(b)(2) is beyond what is contemplated under traditional removal hearings. As the Supreme Court has noted, "where a determination made in an admin-

istrative proceeding is to play a critical role in the subsequent imposition of a criminal sanction, there must be *some* meaningful review of the administrative proceeding." *Mendoza–Lopez,* 481 U.S. at 838–39, 107 S.Ct. 2148 (emphasis in original). Reinstatement of a prior order obtained without reference to the alleged criminal act does not have the traditional safeguards afforded at a removal or deportation hearing. By its nature the reinstatement would not even consider the effect of the intervening criminal act because the remedy is predicated on the prior order of removal, not intervening events. Such an interpretation is consistent with what in fact the government did in 1999 when it reinstated Luna–Madellaga's 1995 deportation order without reference to the aggravated felony commissioned in 1997.

## IV

On the same day that this case was argued, another panel of our Court considered a similar question in *United States v. Carrillo–Lopez* and reached a conclusion similar to the majority's. *See United States v. Carrillo–Lopez,* 313 F.3d 1185 (9th Cir.2002) (per curiam). However, there is a significant factual distinction between *Carrillo–Lopez* and the instant case. In *Carrillo–Lopez,* the defendant was convicted of an aggravated felony in June 1995, ordered deported six months later, and sentenced in 1998 for the underlying aggravated felony when it was discovered he had returned to the country. The defendant argued that the fact that sentencing took place following the issuance of an order of deportation rendered him ineligible for a § 1326(b)(2) sentence enhancement. Because § 1326(b)(2) refers to enhancement on the basis of a conviction, rather than on the basis of a sentence, I agree with the *Carrillo–Lopez* panel's conclusion that the § 1326(b)(2) enhancement was appropriate in that case. In addition, we have held consistently that

the aggravated felony classification is made at the time of the reentry violation. *United States v. Maria–Gonzalez,* 268 F.3d 664, 669–70 (9th Cir.2001). However, to the extent that the panel relied on the logic of *Nava–Perez* to equate a "reinstatement" with a "removal," I respectfully disagree, for the reasons previously given.

All departures from this country are not removals as that term is used in IIRIRA. To hold otherwise is not only contrary to the statute, but subjects the instant defendant to a potential tenfold increase in his sentence without due process of law. In order to apply the increased penalty under § 1326(b)(2), an alien without status must be one "whose removal was subsequent to a conviction for commission of an aggravated felony." *Id.* The government would place words in the statute that are not there, substituting either "departure" or "reinstatement" for "removal." The government's construction also would render meaningless the statute's requirement that the removal be subsequent to the commission of the crime. A careful examination of the statute, its structure and its legislative history cannot support such a construction. If the government wishes to seek a tenfold penalty increase, as it is certainly entitled to do, it must comply with the available statutory requirements. It did not do so in this case.

For these reasons, I respectfully dissent.