**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
       *Plaintiff-Appellant,*

v.

NOE ARIAS-ORDONEZ,
       *Defendant-Appellee.*

No. 08-10259

D.C. No.
3:07-cr-00738-MMC

OPINION

Appeal from the United States District Court
for the Northern District of California
Maxine M. Chesney, District Judge, Presiding

Argued and Submitted
October 9, 2009—San Francisco, California

Filed March 8, 2010

Before: Mary M. Schroeder and Marsha S. Berzon,
Circuit Judges, and Milton I. Shadur,* District Judge.

Opinion by Judge Schroeder

*The Honorable Milton I. Shadur, Senior United States District Judge
for the Northern District of Illinois, sitting by designation.

## COUNSEL

Owen P. Martikan, San Francisco, California, for the plaintiff-appellant.

Elizabeth M. Falk, San Francisco, California, for the defendant-appellee.

## OPINION

SCHROEDER, Circuit Judge:

This government appeal arises in the context of an apparently routine prosecution for reentry after removal under 8 U.S.C. § 1326 that turned out to be anything but routine. The alien did everything he was instructed to do to effectuate his removal, after it had been ordered in absentia. He even sent his mother to report for removal in his place while he obtained proper identification. But the order instructing him to report for removal misinformed him that he had no administrative remedies and he was never told that he had a right to reopen to seek voluntary departure. The government does not contest the district court's ruling that the flaws in the underlying removal prejudiced the alien. The government argues, however, that the subsequent summary reinstatements of the flawed removal can support the criminal indictment for illegal reentry. We think not and affirm the district court's dismissal of the indictment.

## BACKGROUND

Noe Arias-Ordonez is a citizen of Mexico who has lived in this country since the age of ten and now has a United States

citizen child. He was convicted in 2002 of misdemeanor possession of a controlled substance and placed in removal proceedings. His mother posted a $5000 bond to secure his release and informed ICE officials of his address. Just before his release from detention, Arias-Ordonez received a notice to appear at a removal hearing, but the notice did not state the date it would take place. That information was not sent for another week, when the clerk at the immigration court sent the notice by regular mail. The government does not dispute that Arias-Ordonez never received it. He was removed in absentia on June 6, 2003.

ICE sent the subsequent order to report for removal by certified mail the following October, and Arias-Ordonez did receive it. The order to report said:

> As you know, following a hearing in your case you were found removable and the hearing officer has entered an order of removal. A review of your file indicates that there is no administrative relief which may be extended to you, and it is now incumbent on this Service to enforce your departure from the United States.

The statement that there were no administrative remedies available was not a true statement, because an alien ordered removed in absentia has a statutory right to seek to reopen his case and petition for relief. *See* 8 U.S.C. § 1229a(b)(5)(C)(ii); 8 C.F.R. § 1003.23(b)(4)(ii).

When Arias-Ordonez nevertheless reported for removal to comply with the order, he was originally turned away for lack of proper identification. He complied with the instructions for removal so assiduously that he sent his mother to tell the authorities he was coming, while he retrieved his ID. The authorities eventually told him to return the next day, and when he did, he was promptly removed.

Because Arias-Ordonez was no longer in this country, he no longer had any legally recognized right to petition for reopening. *See* 8 C.F.R. § 1003.2(d) ("A motion to reopen or a motion to reconsider shall not be made by or on behalf of a person who is the subject of exclusion, deportation, or removal proceedings subsequent to his or her departure from the United States."); *Singh v. Gonzales*, 412 F.3d 1117, 1120-21 (9th Cir. 2009) ("The Board interpreted [8 C.F.R. § 1003.2(d)] to mean that any time a petitioner files a motion to reopen after departing the country, the motion is barred.").

After his original removal, Arias-Ordonez repeatedly returned to this country. Each time, the government in summary proceedings reinstated the original removal order and sent him back to Mexico, for a total of seven reinstatements.

Finally, in 2007, the United States indicted Arias-Ordonez pursuant to 8 U.S.C. § 1326. Section 1326(a) authorizes imprisonment and fines for any alien who has been removed or who departs while an order of removal is outstanding and who thereafter enters or attempts to enter the United States. 8 U.S.C. § 1326(a). An immigrant who is charged with illegal reentry may, however, under limited circumstances, collaterally attack a removal order the government introduces to meet its burden of proof. 8 U.S.C. § 1326(d). The statute limits such collateral attacks to those situations in which the alien has exhausted his administrative remedies, the removal order has improperly deprived the alien of the opportunity for judicial review, and the entry of the removal order was "fundamentally unfair." *Id.*

Relying on § 1326(d), Arias-Ordonez moved for dismissal of the indictment on the grounds that his original removal order was infirm because he had been removed in absentia without having received notice of the hearing, and also because the order to report for removal was affirmatively misleading. The district court rejected his first contention, that his failure to receive the notice of the time and place of the hear-

ing invalidated the removal proceeding. We do not need to address this issue. The court agreed with Arias-Ordonez, however, that the order to report was affirmatively misleading because it told him that he had no administrative remedies when in fact he did. The court ruled that the misinformation invalidated the original removal.

The government then attempted to support the illegal reentry charge by relying on the summary reinstatements of the original order, but the district court held that the government could not use summary reinstatements of an invalid removal to sustain a prosecution for illegal reentry. In ordering the indictment dismissed, the court explained that when a due process violation has occurred, "you can't take a reinstatement and launder the original deportation" because the reinstatement "bears the same taint as the original deportation." The government now appeals pursuant to 18 U.S.C. § 3731.

We review de novo a district court's ruling on a motion to dismiss an indictment for illegal reentry, where the defendant has asserted a denial of due process in the underlying removal. *United States v. Ubaldo-Figueroa*, 364 F.3d 1042, 1047 (9th Cir. 2004).

## DISCUSSION

### I.   Constitutional and Statutory Background

**[1]** The Supreme Court in 1987 ruled that as a matter of due process, a defendant must be permitted to bring a collateral challenge to a prior deportation that underlies a criminal charge, where the prior deportation proceeding effectively eliminated the right of the alien to obtain judicial review. *See United States v. Mendoza-Lopez*, 481 U.S. 828, 107 S.Ct. 2148 (1987). The petitioners in *Mendoza-Lopez* had been deported after a group hearing, in which the Immigration Judge ("IJ") had failed to explain the availability of relief from deportation or the aliens' right to appeal. *Id.* at 830, 839-

40. After being deported, the aliens reentered the United States, and were apprehended and charged with illegal reentry under § 1326. *Id.* at 830-31. The illegal reentry statute at that time did not expressly allow for collateral attack of a prior deportation order. *Id.* at 837. The Court therefore reached the constitutional issue and held that due process does not permit the imposition of criminal sanctions unless the underlying civil order is subject to meaningful judicial review. *Id.* at 837-39.

**[2]** Congress codified that principle at 8 U.S.C. § 1326(d). The statute now provides for collateral attack of the removal if "(1) the alien exhausted any administrative remedies that may have been available to seek relief against the order; (2) the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and (3) the entry of the order was fundamentally unfair." 8 U.S.C. § 1326(d). Under our case law, a predicate removal order satisfies the condition of being "fundamentally unfair" for purposes of § 1326(d)(3) when the deportation proceeding violated the alien's due process rights and the alien suffered prejudice as a result. *Ubaldo-Figueroa*, 364 F.3d at 1048. We therefore address these statutory and constitutional requirements with respect to the original removal and the subsequent reinstatements.

## II.    The Original Removal

**[3]** We have long held there is a violation of due process when the government affirmatively misleads an alien as to the relief available to him. *See Walters v. Reno*, 145 F.3d 1032, 1043 (9th Cir. 1998) (holding that giving "confusing" and "affirmatively misleading" forms to immigrants charged with document fraud deprived the recipients of their due process rights); *see also Ubaldo-Figueroa*, 364 F.3d at 1050 (due process violated where IJ failed to inform alien of his eligibility for relief under § 212(c)); *United States v. Ortiz-Lopez*, 385 F.3d 1202, 1204 (9th Cir. 2004) (due process violated where

IJ failed to inform alien of eligibility for voluntary departure). Our circuit law is also well established that § 1326(d)'s requirements of exhaustion and deprivation of judicial review are satisfied when the government misinforms an alien that he is ineligible for relief. *See, e.g.*, *United States v. Palleres-Galan*, 359 F.3d 1088, 1098 (9th Cir. 2004); *Ortiz-Lopez*, 385 F.3d at 1204 n.2; *Ubaldo-Figueroa*, 364 F.3d at 1050.

**[4]** We therefore first consider whether the order to report misinformed Arias-Ordonez about his eligibility for possible relief. The order stated that there was "no administrative relief which may be extended." That was untrue. An alien deported in absentia has a statutory right to explain why he did not appear and to move to reopen proceedings. *See* 8 U.S.C. § 1229a(b)(5)(C)(ii); 8 C.F.R. § 1003.23(b)(4)(ii). The Immigration and Nationality Act provides that an alien may request rescission of a removal ordered in absentia in "a motion to reopen filed at any time if the alien demonstrates that the alien did not receive notice in accordance with" statutory requirements. 8 U.S.C. § 1229a(b)(5)(C)(ii). Once a case is reopened, an alien may then petition for substantive relief. *See* 8 C.F.R. § 1003.23(b)(3).

**[5]** The law thus afforded Arias-Ordonez an opportunity to move to reopen and pursue relief, but the order to report told him unequivocally that there was nothing he could do. The district court therefore correctly held that the order was affirmatively misleading and rejected the government's argument that any mistake in the order was minor.

The government on appeal relies on *United States v. Hinojosa-Perez*, 206 F.3d 832 (9th Cir. 2000), where we found an alien could not collaterally attack his removal because he failed to exhaust administrative remedies. The situation in that case, however, was quite different. In *Hinojosa-Perez*, the alien had received written and oral notice of administrative remedies, including the availability of a motion to reopen. *Id.* at 836. The problem was he did not pursue them

when he had an opportunity to do so. Here, the government told Arias-Ordonez that no such remedies were available so he had no reason or opportunity to try to pursue any. Moreover, the district court in *Hinojosa-Perez* found the alien had successfully utilized the appeals process to his advantage in the past, and had demonstrated an awareness of free legal assistance. *Id.* In this case, although he had a list of attorneys, the district court explicitly found that Arias-Ordonez was not sophisticated, and there is no indication he knew how to pursue administrative or judicial remedies. The defendant in *Hinojosa-Perez* was not deported until eight days after being taken into custody, a period of time we held was adequate to seek a reopening, *id.*, whereas Arias-Ordonez spent seven days with misinformation that he had no remedies available, and then was removed as soon as he turned himself in. *Hinojosa-Perez* is not on point.

With respect to prejudice, the district court found that Arias-Ordonez had a plausible claim to voluntary departure and would have pursued this remedy rather than submit to immediate removal. This the government does not dispute on appeal. There is no question in this case that the affirmatively misleading statement prejudiced Arias-Ordonez.

**[6]** The district court correctly sustained the defendant's collateral attack on the original removal order by finding both a denial of due process and prejudice. The court correctly concluded that under the controlling authorities the original order could not support a prosecution for illegal reentry. *See* 8 U.S.C. § 1326(d); *Mendoza-Lopez*, 481 U.S. at 837-39.

## III.   The Reinstatements

The government next contends that even if the original removal proceeding was constitutionally flawed and could not lawfully support a charge of illegal reentry, the later reinstatements of that removal provide an independent basis for the illegal reentry charge. The reinstatements totaled seven sepa-

rate, summary proceedings, all reinstating the original order of removal.

**[7]** The illegal reentry statute criminalizes reentry into the United States by "any alien who . . . has been denied admission, excluded, deported, or removed . . . ." 8 U.S.C. § 1326(a)(1). A "reinstatement" is an administrative procedure through which immigration officials can rely on a prior removal order to effect an alien's departure from the country, bypassing the procedural requirements, and protections, of a regular removal proceeding. *See* 8 U.S.C. § 1231(a)(5); *Morales-Izquierdo v. Gonzales*, 486 F.3d 484, 489-91 (9th Cir. 2007) (en banc). Congress adopted the current reinstatement provision in 1996. It provides that if an alien has illegally reentered the United States after removal, the prior order of removal can be reinstated as of the original date, and the alien is not eligible for any relief and may be removed at any time after reentry:

> [T]he prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed, the alien is not eligible and may not apply for any relief . . . and the alien shall be removed under the prior order at any time after the reentry.

8 U.S.C. § 1231(a)(5).

The government argues that if it can't rely on the original removal, it can instead rely on the reinstatements. The government's problem is that all of Arias-Ordonez's reinstatements were reinstatements of the original removal. That removal was not legally sound. Therefore, none of the reinstatements is legally any stronger than the original order. As we have seen, the original removal was statutorily and constitutionally flawed, so the reinstatements stand on no stronger legal basis. As the district court recognized, the government has built a house of cards that falls once the first is removed.

**[8]** The starting point for our analysis of the reinstatements, as it was for the original order, is the Supreme Court's seminal decision in *Mendoza-Lopez*, which held that a prior removal may only become an element of a criminal conviction if the defendant has had an opportunity to collaterally attack its validity. 481 U.S. at 837-39. We have already held that Arias-Ordonez can successfully attack his original removal. He must also be able to attack the validity of the later reinstatements. The issue is whether they have validity independent of the original removal.

The government relies on our decision in *Morales-Izquierdo v. Gonzales*, 486 F.3d 484 (9th Cir. 2007) (en banc). We there upheld the validity of a summary reinstatement, even though the reinstatement lacked the safeguards of a removal proceeding. The government thus contends that due process presents no obstacles to reliance in this criminal proceeding on a reinstatement of Arias-Ordonez's original removal order, because a summary reinstatement itself violates no constitutional protections. The government relies on *Morales-Izquierdo* to assert that a summary reinstatement may always be used to support a criminal conviction without regard to *Mendoza-Lopez*'s requirement that a defendant have a right to attack an underlying removal order that is fundamentally unfair.

The government's argument proves too much, as *Morales-Izquierdo* actually supports Arias-Ordonez in this case. The reinstatement order in *Morales-Izquierdo* was before us on a petition for review of the reinstatement and we held the truncated reinstatement proceeding was lawful. Our decision in *Morales-Izquierdo* makes it even more important to ensure that the original removal proceeding complies with statutory and constitutional safeguards, in order to enable a summary reinstatement to serve its intended purpose. If the original removal does not comply with due process, it cannot survive later collateral review when, as here, the government attempts

to use a reinstatement as an element of a criminal prosecution. An analysis of our holding makes this apparent.

In *Morales-Izquierdo*, we considered, en banc, a statutory and constitutional challenge to a regulation which, for the first time, allowed immigration officers rather than immigration judges to make reinstatement determinations. 486 F.3d at 487-88. The Attorney General had adopted the regulation after Congress significantly expanded the use of reinstatement in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996. *Id.* at 487-88, 494. Our court, sitting en banc, upheld the regulation. We did so in light of the limited and specialized role that reinstatement plays in the post-1996 immigration regime. *See id.* at 489-98.

In holding that it was appropriate to have immigration officers make reinstatement determinations, we found reinstatements to be materially different from formal removal proceedings, over which immigration judges must preside. In removal proceedings, the inquiry can be "complex and fact-intensive." *Id.* at 491. For that reason, the determination of whether an alien is removable or should be granted relief from removal "requires a formal hearing before a trier of fact." *Id.* In contrast, we described reinstatement as a "narrow and mechanical" process, involving only three simple inquiries: (1) verifying the identity of the alien; (2) obtaining the prior order of removal; and (3) determining whether the alien reentered the United States illegally. *Id.* at 495-96. Thus, we held, the requirement that immigration judges preside over removal proceedings because of their potential complexity should not extend to the reinstatement context. *Id.* at 498.

In addition to his general challenge to the reinstatement regulation, the petitioner in *Morales-Izquierdo* argued, in petitioning for review of the reinstatement, that his particular removal order could not have been reinstated without violating his due process rights, because the underlying removal order itself violated due process. *Id.* at 497. Overruling a prior

decision in *Arreola-Arreola v. Ashcroft*, 383 F.3d 956, 963 (9th Cir. 2004), we held that even in that circumstance, the reinstatement itself did not violate due process. *Id.* at 497-98. We explained that the effect of reinstatement itself was simply to return the alien to the same legal position he occupied prior to the illegal reentry:

> The *only* effect of the reinstatement order is to cause [the alien's] removal . . . . The reinstatement order imposes no civil or criminal penalties, creates no new obstacles to attacking the validity of the removal order . . . and does not diminish petitioner's access to whatever path for lawful entry into the United States might otherwise be available to him under the immigration laws.

*Id.* We held such a conclusion followed from the Supreme Court's decision in *Fernandez-Vargas v. Gonzales*, 540 U.S. 30, 126 S.Ct. 2422 (2006). There the Court held that the reinstatement provision of the 1996 Act was not impermissibly retroactive because the reinstatement itself "does not penalize an alien for reentry (criminal and civil penalties do that)." 540 U.S. at 44, 126 S.Ct. at 2432.

**[9]** Yet, under the government's theory of this case, the reinstatement would create an additional basis for criminal punishment that did not exist as a result of the original removal. We conclude this is not consistent with our decision in *Morales-Izquierdo*, because the underpinning of *Morales-Izquierdo* is that the alien will not face criminal punishment as a consequence of reinstatement. *See* 486 F.3d at 497-98. In *Morales-Izquierdo*, we held that the alien's due process rights were not offended by reinstatement of his faulty removal order precisely because reinstating the original order left the alien no worse off than before reentry; reinstatement would not result in criminal punishment or any new civil disability. *Id.* In contrast, if reinstatement of a faulty removal order were used as an independent basis for an illegal reentry conviction,

the alien would be much worse off, because criminal penalties would be imposed, without any opportunity for collateral attack of the original order.

In this criminal proceeding, according to the government, the only collateral attack available to the alien would be limited to procedural irregularities in the reinstatement, and we would never address the validity of the removal that was reinstated. Direct review of the original order is not available at the time that order is reinstated, because the reinstatement statute prohibits review of the underlying order. *See* 8 U.S.C. § 1231(a)(5) (providing that if the conditions for reinstatement are met, "the prior order of removal is reinstated . . . and is not subject to being reopened or reviewed . . . ."). For this reason, we held in *Morales-Izquierdo* that the validity of the original removal is inconsequential to the validity of the reinstatement. *See* 486 F.3d at 497-98.

**[10]** When the reinstatement becomes an element of a criminal charge, however, limiting review to the procedural requirements for reinstatement without regard to the soundness of the underlying removal proceeding implicates due process concerns by effectively foreclosing all opportunity for "meaningful" review of the underlying removal. This is a result contrary to the Supreme Court's teaching in *Mendoza-Lopez*. *See* 481 U.S. at 837-38 ("[W]here a determination made in an administrative proceeding is to play a critical role in the subsequent imposition of a criminal sanction, there must be *some* meaningful review of the administrative proceeding."). The government's theory thus runs afoul of *Mendoza-Lopez*'s guarantee of the right to seek a collateral attack after criminal proceedings are filed. *See id.* at 837-39. We must therefore conclude that when the government relies upon a reinstatement as a basis for a reentry prosecution, due process requires that the defendant have an opportunity to attack the validity of the underlying removal proceeding.

Our conclusion that *Mendoza-Lopez* permits a challenge to the original removal order underlying a reinstatement used to

support a criminal indictment is consistent with the Third Circuit's decision in *United States v. Charleswell*, 456 F.3d 347 (3d Cir. 2006). In *Charleswell*, the Third Circuit rejected the government's contention that the court did not have jurisdiction to review the original removal order where the indictment for illegal reentry cited only the reinstatement. The Third Circuit held that *Mendoza-Lopez* requires an opportunity for the alien to bring a collateral attack on the original order. *Id.* at 351-52. "To hold otherwise," it explained, "would allow the government to avoid the consequences of a fundamentally unfair underlying deportation or removal proceeding simply by deleting it from the indictment . . . ." *Id.* at 352. It thus disapproved precisely what the government is attempting to do here.

The district court correctly and succinctly assessed the situation when it said that the government could not launder the tainted removal by reinstating it. *Mendoza-Lopez* and *Morales-Izquierdo* compel us to hold that a valid reinstatement of a invalid removal order cannot transform the prior order into a valid predicate for an illegal reentry conviction.

The government nevertheless additionally suggests that even if the original removal cannot survive Arias-Ordonez's challenge, our decisions in *United States v. Luna-Madellaga*, 315 F.3d 1224 (9th Cir. 2003), and *United States v. Diaz-Luevano*, 494 F.3d 1159 (9th Cir. 2007) (per curiam), nevertheless support the validity of the indictment. These were sentencing enhancement cases, however, addressing a very different problem. *Luna-Madellaga* and *Diaz-Luevano* decided whether the district court properly applied the sentencing enhancement in 8 U.S.C. § 1326(b). Subsection (b) provides for an enhanced penalty of up to twenty years for an alien who reenters after removal for commission of an aggravated felony.

In *Luna-Madellaga*, we considered whether the district court properly enhanced the sentence of an alien who had

been removed, was subsequently convicted of an aggravated felony, and then, after reinstatement of the original removal order, was removed again. 315 F.3d at 1225. Section 1326(b) provides that an alien "whose removal was *subsequent to* a conviction for commission of an aggravated felony" is eligible for a sentence of up to 20 years. 8 U.S.C. § 1326(b) (emphasis added). The alien contended that he should not have his punishment enhanced on account of an aggravated felony committed *after* he was ordered removed, because there could have been no "removal . . . subsequent to a conviction" within the meaning of the statute. 315 F.3d at 1226.

We held in *Luna-Madellaga* that the word "removal" in the context of the sentencing enhancement provision referred to the alien's physical removal, not the removal order arising out of a removal proceeding. *Id.* Because the alien was physically removed "subsequent to" the felony conviction, he was therefore subject to the enhanced punishment. *Id.* By reading "removal" to refer to the alien's physical removal, the panel majority did not have to address whether the summary reinstatement proceeding was equivalent to a "removal" in any other legal context. *See id.* at 1226-27. *Luna-Madellaga* explicitly pointed out that the alien had "already received a full and fair hearing, including judicial review of that prior hearing, which afford[ed] all the process to which he was entitled." *See id.*

After we decided *Morales-Izquierdo*, another defendant in the same situation as *Luna-Madellaga* again challenged the application of the sentencing enhancement, contending that *Morales-Izquierdo*'s sharp distinction between removal and reinstatement had invalidated *Luna-Madellaga*'s reading of § 1326(b). *See Diaz-Luevano*, 494 F.3d at 1161. We disagreed, and reaffirmed *Luna-Madellaga. Id.* at 1162. In so doing, we confirmed that the predicates for the sentence enhancement provision of § 1326(b) stand separate and apart from the statutorily defined procedures for removals and reinstatements.

*Diaz-Luevano* and *Luna-Madellaga* thus cannot be read to suggest that "removal," the fundamental concept of our immigration law enforcement, always means "physical removal" wherever the words "removal" or "removed" appear in our criminal immigration laws. Nor do the sentencing cases hold that a summary reinstatement has validity independent of the underlying order being reinstated. The cases relate to the application of the language in § 1326(b) to a specific sequence of events, a valid removal order and conviction of an aggravated felony, not relevant here. *Luna-Madellaga* and *Diaz-Luevano* thus do not support the government's attempt to rely on reinstatements of a removal that cannot withstand collateral attack.

**[11]** Moreover, we have previously assumed the result we reach today. *See United States v. Leon-Paz*, 340 F.3d 1003 (9th Cir. 2003). In *Leon-Paz*, the defendant had been removed, and his original removal had been twice reinstated, before he was convicted of illegal reentry. *Id.* at 1004. On appeal, the defendant contended that the district court erred in rejecting his collateral attack on the original removal; we agreed, finding that the removal violated due process. *Id.* at 1007. The district court had not considered, however, whether the defendant had suffered prejudice, and so we remanded for consideration of that issue. *Id.* We assumed that on remand the reinstatements alone could not alternatively support the defendant's conviction, and instructed that if the defendant was prejudiced, "the district court must dismiss the indictment." *Id.* Today we express what we implied in *Leon-Paz*: a successful collateral attack on a removal order precludes reliance on a reinstatement of that same order in criminal proceedings for illegal reentry.

## CONCLUSION

The original removal order could not justify a conviction for illegal reentry because the government affirmatively and prejudicially misled Arias-Ordonez as to his statutory right

after his removal in absentia to seek to reopen his removal proceedings. Nor could any of the subsequent reinstatements provide an independent basis for conviction of illegal reentry because they reinstated a removal that did not comply with due process. The judgment of the district court dismissing the indictment is **AFFIRMED**.