**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RAUL MORALES-IZQUIERDO,
                                    *Petitioner,*

v.

ALBERTO R. GONZALES, Attorney
General,
                                    *Respondent.*

No. 03-70674

INS No.
A79-166-816

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
December 13, 2005—Portland, Oregon
Proceedings Stayed January 5, 2006
Resubmitted June 22, 2006

Filed February 6, 2007

Before: Mary M. Schroeder, Chief Judge, Harry Pregerson,
Stephen Reinhardt, Alex Kozinski, Pamela Ann Rymer,
Michael Daly Hawkins, Sidney R. Thomas, Susan P. Graber,
William A. Fletcher, Ronald M. Gould and Jay S. Bybee,
Circuit Judges.

Opinion by Judge Kozinski;
Dissent by Judge Thomas

**COUNSEL**

Robert Pauw, Gibbs Houston Pauw, Seattle, Washington, for the petitioner.

Peter D. Keisler, Assistant Attorney General, Civil Division; Jonathan F. Cohn, Deputy Assistant Attorney General; Donald E. Keener, Deputy Director, Office of Immigration Litigation; John Andre, Senior Litigation Counsel, Office of Immigration Litigation, Civil Division, Washington, D.C., for the respondent.

Trina A. Realmuto and Nadine K. Wettstein, American Immigration Law Foundation, Washington, D.C., as amici curiae in support of the petitioner.

## OPINION

KOZINSKI, Circuit Judge:

When an alien subject to removal leaves the country, the removal order is deemed to be executed. If the alien reenters the country illegally, the order may not be executed against him again unless it has been "reinstated" by an authorized official.[1] Until 1997, removal orders could only be reinstated by immigration judges. That year, the Attorney General changed the applicable regulation to delegate this authority, in most cases, to immigration officers. We consider whether this change in regulation is valid.

---

[1]Why this is so is not clear, and neither party explains it. It's certainly possible to conceive of a system where a removal order remains in force permanently and may be re-executed whenever the alien is found to have reentered the country illegally. As Judge Fernandez has noted, "there is nothing unusual about allowing multiple executions on a judgment until the full relief under it has been obtained." *Castro-Cortez* v. *INS*, 239 F.3d 1037, 1055 (9th Cir. 2001) (Fernandez, J., dissenting), *abrogated by Fernandez-Vargas* v. *Gonzales*, 126 S. Ct. 2422, 2427 & n.5 (2006). That, however, does not appear to be the way our immigration law has developed.

# I

Morales-Izquierdo, a native and citizen of Mexico, was arrested in 1994 for entering the United States without inspection. He was released and served with a mail-out order to show cause.[2] Eventually, a removal hearing was scheduled, and Morales was notified via certified mail of the time and place of the hearing. When Morales failed to attend the hearing, he was ordered removed in absentia.[3] Morales claims he never received notice of the hearing date, but the record shows that the notice was mailed to his address of record, and the Immigration and Naturalization Service (INS) received a return receipt bearing the signature "Raul Morales."

A warrant of removal was issued, and the INS apprehended and removed Morales from the United States in 1998.[4] He

---

[2]When an alien is apprehended for an immigration violation, the immigration officer typically serves the alien with what is known as a mail-out order to show cause. What this means is that the alien is handed the order upon submitting an address of record. This order explains why the alien is in proceedings and under what legal authority, and it provides the address of the Immigration Court. 8 C.F.R. § 1003.15. The order also states that an alien must advise that court of any change in address, and that failure to provide such information may result in an in absentia hearing. *Id.* It's called a "mail-out" order because notice of the hearing date is subsequently mailed out to the alien's address of record.

[3]Morales' 1994 removal order was actually a "deportation" order, though the difference is of no legal consequence. The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, div. C, 110 Stat. 3009-546, replaced all references to "deportation" with "removal." *See* Gerald L. Neuman, *Habeas Corpus, Executive Detention, and the Removal of Aliens*, 98 Colum. L. Rev. 961, 966 (1998) ("IIRIRA realigned the vocabulary of immigration law, creating a new category of 'removal' proceedings that largely replaces what were formerly exclusion proceedings and deportation proceedings . . . ."). To avoid more confusion than necessary, we use the term "removal," even when referring to a pre-1996 "deportation."

[4]Contrary to the administrative record, Morales claims he was not removed at all, but that he voluntarily departed. The difference is immaterial for reinstatement purposes. *See* n.14 *infra*.

attempted to reenter illegally in January 2001—this time using a false border-crossing card. He was apprehended at the port of entry, and was expeditiously removed for misrepresenting a material fact in violation of the Immigration and Nationality Act (INA) § 212(a)(6)(C)(i), 8 U.S.C. § 1182(a)(6)(C)(i).[5] Undaunted, Morales reentered the United States undetected the following day—a fact he disclosed to the immigration officer during the reinstatement proceeding.

Sometime between his 1998 and 2001 removals, Morales married a United States citizen. In March 2001, Morales' wife filed an I-130 alien relative petition based on his marriage to a United States citizen. When Morales and his wife met with the INS in January 2003, an immigration officer served them with a denial of the I-130 petition and a notice of intent to reinstate Morales' removal order in accordance with INA § 241(a)(5), 8 U.S.C. § 1231(a)(5) and 8 C.F.R. § 241.8. Morales petitioned here for review of the reinstatement order.

The case came before a three-judge panel, which held that the regulation authorizing immigration officers to issue reinstatement orders is invalid and Morales' removal order could only be reinstated by an immigration judge. *See Morales-Izquierdo* v. *Ashcroft*, 388 F.3d 1299, 1305 (9th Cir. 2004). We took the case en banc. *See Morales-Izquierdo* v. *Gonzales*, 423 F.3d 1118 (9th Cir. 2005).

## II

As noted, Morales cannot be removed again under the 1994 removal order unless and until it was reinstated. The order was reinstated by an immigration officer, who acted pursuant to 8 C.F.R. § 241.8, which authorizes immigration officers—

---

[5]Pre-IIRIRA, this expedited removal at the border would have been called an "exclusion." However, "removal" now encompasses both "exclusion" and "deportation." *See* n.3 *supra*. Again, Morales denies that he was forcibly removed, claiming that he departed voluntarily.

rather than immigration judges[6]—to reinstate prior removal orders of aliens who illegally reenter the United States.[7] Morales argues that the Attorney General exceeded his authority in promulgating the regulation. The three-judge panel so held. However, the First, Sixth, Eighth and Eleventh Circuits have upheld the regulation against similar challenges. *See De Sandoval* v. *U.S. Att'y Gen.*, 440 F.3d 1276, 1283 (11th Cir. 2006); *Ochoa-Carrillo* v. *Gonzales*, 437 F.3d 842, 846 (8th Cir. 2006); *Lattab* v. *Ashcroft*, 384 F.3d 8, 20 (1st Cir. 2004). The Sixth Circuit saw the matter as so clear-cut that it did not deem it necessary to publish its disposition upholding the regulation. *Tilley* v. *Chertoff*, 144 Fed. App'x 536, 539-40 (6th Cir. 2005) (mem.), *cert. denied*, 127 S. Ct. 62 (2006). No other court has reached a contrary conclusion.

**[1] A.** In determining whether 8 C.F.R. § 241.8 is valid, we apply the familiar *Chevron* two-step approach. *Chevron U.S.A. Inc.* v. *Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). Under *Chevron* step one, we ask "whether Congress has directly spoken to the precise question at issue," *id.* at 842 —i.e., whether DHS can reinstate a prior removal order without a full-blown hearing before an immigration judge.

**[2]** Here, two sections of the INA are potentially implicated. The first, INA § 240, titled "Removal proceedings,"

---

[6]A prior regulation required a hearing before an immigration judge. 8 C.F.R. § 242.23 (repealed 1997).

[7]This regulation was originally adopted by the INS, which was part of the Department of Justice. *See* Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10,312, 10,379 (Mar. 6, 1997) (codified in scattered parts of 8 C.F.R.). The INS ceased to exist in 2003, and most of its functions were transferred to the Department of Homeland Security (DHS). *See* Homeland Security Act of 2002, Pub. L. No. 107-296, §§ 441, 471, 116 Stat. 2135, 2192, 2205 (codified at 6 U.S.C. §§ 251, 291). To minimize confusion, we use the term "INS," even when referring to DHS' successor to the INS-U.S. Immigration and Customs Enforcement.

requires that "[a]n immigration judge shall conduct proceedings for deciding the inadmissibility or deportability of an alien." INA § 240(a)(1), 8 U.S.C. § 1229a(a)(1).[8] The second relevant section, INA § 241, titled "Reinstatement of removal orders against aliens illegally reentering," provides:

> If the Attorney General finds that an alien has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal, the prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed, the alien is not eligible and may not apply for any relief under this chapter, and the alien shall be removed under the prior order at any time after the reentry.

INA § 241(a)(5), 8 U.S.C. § 1231(a)(5). Section 241 makes no mention of a hearing before an immigration judge, or any other procedure. Most of the section is devoted to limiting the alien's rights and ensuring that the removal is carried out expeditiously.

[3] Morales argues that Congress spoke clearly as to whether a hearing before an immigration judge is required for reinstating a prior removal order, and did so in INA § 240. While recognizing that reinstatement is mentioned nowhere in this section, Morales claims a reinstatement order is functionally a removal order because it has the effect of authorizing an alien's removal. In other words, reinstatement is simply a species of removal, and is thus governed by INA § 240, which calls for a hearing before an immigration judge. In support of his argument, Morales points out that when Congress has

---

[8]Section 240 also provides certain procedural protections: the right to representation, "a reasonable opportunity to examine the evidence against the alien, to present evidence on the alien's own behalf, and to cross-examine witnesses," and a complete record of the proceedings. INA § 240(b)(4), 8 U.S.C. § 1229a(b)(4).

intended to exempt certain removal proceedings from the INA § 240 hearing requirement, it has done so explicitly.[9] Reinstatement is not among those proceedings explicitly exempted.

[4] Morales' argument that the failure to exempt reinstatement from the requirement that a hearing be held before an immigration judge, particularly when similar provisions of the same statute contain explicit exemptions, carries some force. But such failure hardly amounts to the kind of unambiguous expression of congressional intent that would remove the agency's discretion at *Chevron* step one. Far more telling is the fact that reinstatement and removal are placed in different sections, which "logically can be understood as indicating a congressional intention to treat reinstatement determinations differently from first-instance determinations of removability." *Lattab*, 384 F.3d at 18 (citing *Alexander* v. *Sandoval*, 532 U.S. 275, 288-91 (2001)); *see also De Sandoval*, 440 F.3d at 1281. After all, "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (quoting *Davis* v. *Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989) (internal quotation marks omitted)). Here, the fact that Congress placed reinstatement in a separate section from removal suggests that reinstatement is a separate procedure, not a species of removal.

[5] A closer look at the texts of the two sections confirms that Congress intended reinstatement to be a different and far

---

[9] *See* INA § 235(b)(1), 8 U.S.C. § 1225(b)(1) (directing immigration officers to "order the alien removed . . . without further hearing" for lack of valid documents or for fraud); INA § 235(c), 8 U.S.C. § 1225(c) (directing immigration officers to "order the alien removed" if suspected of being inadmissible under security threat grounds, and report the order to the Attorney General who will decide whether to provide a hearing); INA § 238, 8 U.S.C. § 1228 (directing the Attorney General to institute expedited removal procedures—either by an immigration judge or officer—for aliens convicted of aggravated felonies).

more summary procedure than removal. Under INA § 240, first-instance removal proceedings involve a broad inquiry. To order an individual removed, the immigration judge must make two determinations: (1) whether the individual is removable from the United States; and, if so, (2) whether the individual is otherwise eligible for relief from removal. *See* INA § 240, 8 U.S.C. § 1229a. While the first determination can be relatively straightforward, the second is often complex and fact-intensive. The types of relief from removal include cancellation of removal for extreme hardship on U.S. citizen family members, adjustment of status for spouses of U.S. citizens and asylum. *See id.*; *see also* INA § 208, 8 U.S.C. § 1158 (asylum); INA § 240A, 8 U.S.C. § 1229b (cancellation of removal; adjustment of status). Determining what relief is warranted under any of these provisions requires a formal hearing before a trier of fact, such as an immigration judge.

**[6]** The scope of a reinstatement inquiry under INA § 241 is much narrower, and can be performed like any other ministerial enforcement action. The *only* question is whether the alien has illegally reentered after having left the country while subject to a removal order. As the Eleventh Circuit pointed out, INA § 241 reinstatement—unlike INA § 240 first-instance removal—"deprives aliens of any relief, reopening, or review at the reinstatement stage." *De Sandoval*, 440 F.3d at 1281. By barring all relief, Congress eliminated the second and much more difficult removal inquiry. The First and Eighth Circuits similarly found that "the elimination of any exogenous defense to reinstatement significantly narrows the range of issues to be adjudicated, thereby limiting the value of additional procedures." *Lattab*, 384 F.3d at 20; *see also Alvarez-Portillo* v. *Ashcroft*, 280 F.3d 858, 867 (8th Cir. 2002) (same).

Morever, the texts of the two sections differ in their delegation of discretion: INA § 240 expressly requires that an immigration judge conduct removal proceedings, whereas INA § 241 authorizes the Attorney General to reinstate removal

orders. "This distinction suggests Congress knew how to mandate a hearing before an immigration judge, but chose not to do so in the context of reinstatement orders." *De Sandoval*, 440 F.3d at 1281.

**[7]** Given the different layout of the two sections and their very different scope, we conclude that Congress did not consider removal and reinstatement to be equivalent. Certainly, nothing in the text of the INA, or the statutory scheme, supports Morales' argument that reinstatement is merely a species of removal. Nor does anything in the INA express an unequivocal congressional intent that reinstatement proceedings be conducted before an immigration judge. If anything, the statutory scheme supports the opposite conclusion. *See Tilley*, 144 Fed. App'x at 540 ("[T]he regulations promulgated in 8 C.F.R. § 241.8(a) meet all of the requirements of [INA] § 241(a)(5). Therefore, we do not see an ambiguity that requires us to review the agency's implementation of its governing statute."). Indeed, it's hard to imagine why Congress would have bothered with the detailed provisions of INA § 241 if it intended to give an alien subject to reinstatement exactly the same rights and procedural protections as an alien facing removal for the first time.[10]

**[8] B.** While this case could probably be decided under the first *Chevron* inquiry, all other circuits that have published opinions on this matter decided the issue at *Chevron* step two. In an abundance of caution, we therefore proceed to the second step, which requires us to ask "whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. In making this determination, we

---

[10]Or, in the words of Judge Fernandez, "An objective observer would have asked, as Congress did, just what was the purpose of all of that procedure, all of those punctilious niceties, which can take years to complete, if the person could just step back into the country a few days later and have the roundelay go on?" *Castro-Cortez*, 239 F.3d at 1054 (Fernandez, J., dissenting).

"need not conclude that the agency construction was the only one it permissibly could have adopted . . . , or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Id.* at 843 n.11. Rather, "Congress, when it left ambiguity in a statute meant for implementation by an agency, understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows." *Nat'l Cable & Telecomms. Ass'n* v. *Brand X Internet Servs.*, 125 S. Ct. 2688, 2700 (2005) (quoting *Smiley* v. *Citibank (S.D.), N.A.*, 517 U.S. 735, 740-41 (1996) (internal quotation marks omitted)).

Deference to an agency's interpretation "is especially appropriate in the immigration context where officials 'exercise especially sensitive political functions that implicate questions of foreign relations.' " *INS* v. *Aguirre-Aguirre*, 526 U.S. 415, 425 (1999) (quoting *INS* v. *Abudu*, 485 U.S. 94, 110 (1988)). For these reasons, the First, Eighth and Eleventh Circuits had "little difficulty in concluding that the government's interpretation satisfies" the second step of *Chevron. Lattab*, 384 F.3d at 19-20; *see also De Sandoval*, 440 F.3d at 1283; *Ochoa-Carrillo*, 437 F.3d at 846. We find no fault with this conclusion.

Morales raises two issues, however, that our sister circuits did not consider. First, he invokes the doctrine of constitutional avoidance, asking us to construe the statute so as to avoid serious constitutional issues. Morales relies on *Clark* v. *Martinez*, 543 U.S. 371 (2005):

> [W]hen deciding which of two plausible statutory constructions to adopt, a court must consider the necessary consequences of its choice. If one of them would raise a multitude of constitutional problems, the other should prevail—whether or not those constitutional problems pertain to the particular litigant before the Court.

*Id.* at 380-81; *see also INS* v. *St. Cyr*, 533 U.S. 289, 299-300 (2001) (same). According to Morales, construing the statute so as to require that reinstatement hearings be held before an immigration judge would avoid constitutional problems that arise by assigning the reinstatement function to an immigration officer. *See* Part III *infra* (discussing various constitutional challenges Morales raises to the reinstatement process).

The problem with Morales' argument is that we are not deciding between two plausible statutory constructions; we are evaluating an agency's interpretation of a statute under *Chevron*. At step two of this inquiry, our function is "not simply [to] impose [our] own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, . . . the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843 (internal footnote omitted). When Congress has explicitly or implicitly left a gap for an agency to fill, and the agency has filled it, we have no authority to re-construe the statute, even to avoid potential constitutional problems; we can only decide whether the agency's interpretation reflects a plausible reading of the statutory text. *Clark* v. *Martinez*, and the constitutional avoidance doctrine it embodies, plays no role in the second *Chevron* inquiry.

Second, Morales argues that the Attorney General impermissibly eliminated the hearing requirement in 1997, when it had been a mainstay of the reinstatement process during the previous four decades. *Compare* 8 C.F.R. § 242.23(b) (repealed 1997) (requiring a hearing before an immigration judge for reinstatement), *with* 8 C.F.R. § 241.8(a) ("The alien has no right to a hearing before an immigration judge in [reinstatement proceedings]."). Morales labels this argument "[c]ongressional acquiescence in the prior administrative practice." The Supreme Court, however, has drawn a sharp distinction between " 'Congress' deliberate acquiescence' " and its "failure to express any opinion." *Rapanos* v. *United States*, 126 S. Ct. 2208, 2231 (2006) (plurality opinion). Con-

gressional acquiescence can only be inferred when there is "overwhelming evidence" that Congress explicitly considered the "precise issue" presented to the court. *Id.* (quoting *Solid Waste Agency of N. Cook County* v. *U.S. Army Corps of Eng'rs*, 531 U.S. 159, 169 n.5 (2001) ("overwhelming evidence"); *Bob Jones Univ.* v. *United States*, 461 U.S. 574, 600 (1983) ("precise issue")).

Here, we concluded at *Chevron* step one that Congress has not expressed a clear preference that reinstatement hearings be held before immigration judges; if anything, the INA's statutory scheme supports the opposite conclusion. Nor has Morales pointed to anything in the legislative history that discloses congressional acquiescence in the agency's past practice—and certainly not the requisite "overwhelming evidence." A finding of congressional acquiescence must be reserved for those rare instances where it is very clear that Congress has considered and approved of an agency's practice, lest the agency be improperly deprived of the very flexibility Congress intended to delegate. Such is not the case here.

We also understand Morales to be arguing that the agency's change in policy was impermissibly inconsistent with its past practice. An "*[u]nexplained* inconsistency is . . . a reason for holding an interpretation to be an arbitrary and capricious change from agency practice under the Administrative Procedure Act." *Brand X*, 125 S. Ct. at 2699 (emphasis added). This rule, too, is reserved for rare instances, such as when an agency provides no explanation at all for a change in policy, or when its explanation is so unclear or contradictory that we are left in doubt as to the reason for the change in direction. A broader rule would deny agencies the necessary flexibility to change policies in light of "changed factual circumstances, or a change in administrations." *Id.* at 2700. Indeed, *Chevron* itself involved a 180-degree reversal in an agency's position that survived judicial scrutiny. *Chevron*, 467 U.S. at 857-58; *see also id.* at 863 ("An initial agency interpretation is not instantly carved in stone.").

**[9]** The regulatory change here was adequately explained. The change in the reinstatement regulation was part of a major overhaul of the INA's implementing regulations, designed "to implement the provisions of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) and the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)." Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 444, 444 (proposed Jan. 3, 1997) (codified in scattered parts of 8 C.F.R.). The notice accompanying the proposed regulations explains that the cumbersome procedure embodied in the existing reinstatement rule "resulted in limited use of the provision." *Id.* at 451. Such limited use was consistent with pre-IIRIRA law, which applied reinstatement to a narrow class of previously-deported aliens.[11] But IIRIRA dramatically expanded the class of aliens subject to reinstatement, while narrowing the defenses available in such proceedings. As the Supreme Court noted last Term, "In IIRIRA, Congress replaced [the existing] reinstatement provision with one that toed a harder line . . . . Unlike its predecessor, § 241(a)(5) applies to all illegal reentrants, explicitly insulates the removal orders from review, and generally forecloses discretionary relief from the terms of the reinstated order." *Fernandez-Vargas* v. *Gonzales*, 126 S. Ct. 2422, 2426 (2006). Congress' ambitious purpose behind IIRIRA was to "enable the prompt admission of those who are entitled to be admitted, the prompt exclusion or removal of those who are not so entitled, and the clear distinction between these categories."

---

[11]Congress first instituted reinstatement in 1950, but only for certain immigrants (e.g., "subversives" and "anarchists"). *Fernandez-Vargas* v. *Gonzales*, 126 S. Ct. 2422, 2425-26 (2006) (citing Internal Security Act of 1950, § 23, 64 Stat. 1012). The INA, passed in 1952, broadened the reinstatement provision to apply to a somewhat larger class of aliens, those deported for engaging in certain unlawful activities—e.g., smuggling, marriage fraud, crimes of moral turpitude, multiple criminal convictions, aggravated felonies, illegal drug use or dealing, and terrorism activities. *See* INA § 242, 8 U.S.C. § 1252 (repealed 1996).

H.R. Rep. No. 104-469(I), at 111 (1996); *see also id.* at 107 ("Existing procedures to deny entry to and to remove illegal aliens from the United States are cumbersome and duplicative."); U.S. Representative Zoe Lofgren, *A Decade of Radical Change in Immigration Law: An Inside Perspective*, 16 Stan. L. & Pol'y Rev. 349, 354-70 (2005) (asserting, albeit in disagreeing with its purpose, that IIRIRA aimed at streamlining the removal process).

**[10]** The net effect of these statutory changes is two-fold. First, IIRIRA brings vastly more aliens within the sweep of the reinstatement provision, essentially making every removed alien subject to reinstatement if he returns to the United States without the Attorney General's permission. Second, the decision to reinstate is now far more mechanical: There need be no determination whether the alien falls into one of the narrow categories specified in the earlier statute as eligible for reinstatement, *see* n.11 *supra*, and aliens can no longer seek certain kinds of relief, such as adjustment of status. These major legislative changes provide an adequate justification for the Attorney General's decision to make parallel changes to the implementing regulations. "Providing a mechanical procedure for the reinstatement of prior orders is entirely consistent with [IIRIRA's] purpose"—"to make the removal of illegal reentrants more expeditious." *Lattab*, 384 F.3d at 20.

**[11]** We thus conclude that the regulation is a valid interpretation of the INA.

### III

We now turn to Morales' argument that the regulation, if authorized under *Chevron*, is nevertheless invalid because it violates various constitutional guarantees.

**[12] A.** Morales first argues that the regulation violates due process because it assigns the reinstatement determination

to an immigration officer—an official not qualified to resolve disputed questions as to the factual predicates for reinstatement. But reinstatement only requires proof that (1) petitioner is an alien, (2) who was subject to a prior removal order, and (3) who illegally reentered the United States. INA § 241(a)(5), 8 U.S.C. § 1231(a)(5); 8 C.F.R. § 241.8. And "[a]s a predicate to obtaining relief for a violation of procedural due process rights in immigration proceedings, an alien must show that the violation prejudiced him." *Padilla* v. *Ashcroft*, 334 F.3d 921, 924-25 (9th Cir. 2003) (quoting *Ramirez-Alejandre* v. *Ashcroft*, 320 F.3d 858, 875 (9th Cir. 2003) (en banc)). To show prejudice, Morales must present "plausible scenarios in which the outcome of the proceedings would have been different" if a more elaborate process were provided. *Walters* v. *Reno*, 145 F.3d 1032, 1044 (9th Cir. 1998).

We note at the outset that the regulation provides significant procedural safeguards against erroneous reinstatements. First, the immigration officer must verify the identity of the alien. "In disputed cases, verification of identity shall be accomplished by a comparison of fingerprints." 8 C.F.R. § 241.8(a)(2). If no fingerprints are available, the removal order cannot be reinstated under 8 C.F.R. § 241.8. *Id.*; *see also Ochoa-Carrillo*, 437 F.3d at 847 (discussing the fingerprint requirement). Second, the immigration officer "must obtain the prior order of exclusion, deportation, or removal relating to the alien." 8 C.F.R. § 241.8(a)(1). Without this documentation, 8 C.F.R. § 214.8 cannot be used and the matter is referred to an immigration judge.[12] And, third, the offi-

---

[12]Similarly, a removal order cannot be reinstated under 8 C.F.R. § 241.8 if the alien raises either (1) an unresolved adjustment of status claim under the Haitian Refugee Immigrant Fairness Act of 1998 or the Nicaraguan Adjustment and Central American Relief Act, or (2) an asylum claim. *See* 8 C.F.R. § 241.8(d)-(e). If the alien raises an adjustment of status claim under either of these statutes, "[t]he immigration officer may not reinstate the prior order in accordance with this section unless and until a final decision to deny the application for adjustment has been made." 8 C.F.R.

cer must determine whether the alien reentered the United States illegally. "In making this determination, the officer shall consider all relevant evidence, including statements made by the alien and any evidence in the alien's possession. The immigration officer shall attempt to verify an alien's claim, if any, that he or she was lawfully admitted, which shall include a check of Service data systems available to the officer." 8 C.F.R. § 241.8(a)(3).

**[13]** We need not determine whether these procedures are adequate as to all aliens in all cases because Morales does not dispute that he satisfies the statutory predicates for reinstatement. Rather, he argues that his 1994 in absentia removal order is defective because he never got notice of the removal hearing, his 1998 removal was actually a voluntary departure and his marriage to a U.S. citizen entitled him to adjustment of status. But the reinstatement statute specifically precludes Morales from seeking to reopen the previous removal order based on defective service or any other grounds. INA § 241(a)(5), 8 U.S.C. § 1231(a)(5).**[13]** And, that Morales may have departed voluntarily rather than been deported is of no consequence.**[14]** Finally, Morales was not entitled to adjust-

---

§ 241.8(d). Likewise, if the alien "expresses a fear of returning to the country designated in that order, the alien shall be immediately referred to an asylum officer for an interview to determine whether the alien has a reasonable fear of persecution or torture." 8 C.F.R. § 241.8(e); *see also Fernandez-Vargas*, 126 S. Ct. at 2426 n.4 (same). If the asylum officer determines that the fear is reasonable, he must refer the matter to an immigration judge "for full consideration of the request for withholding of removal." 8 C.F.R. § 208.31(e).

**[13]**The INA does have a procedure an alien may use to reopen an in absentia removal order based on a claim of lack of notice, *see* INA § 240(b)(5)(C)(ii), 8 U.S.C. § 1229a(b)(5)(C)(ii), but Morales has failed to avail himself of it.

**[14]**Any mode of departure—voluntary or involuntary—while subject to an order of removal constitutes a removal for reinstatement purposes. *See* INA § 241(a)(5), 8 U.S.C. § 1231(a)(5) (ordering the Attorney General to reinstate a removal order if "an alien has reentered the United States illegally after having been removed or having departed voluntarily [while] under an order of removal").

ment of status.[15] Because none of the grounds Morales raises would have been a proper basis for relief during the reinstatement process, he suffered no prejudice by being denied access to an official who could adjudicate facts that might support these claims. Morales has thus failed to establish the requisite prejudice. *See Padilla*, 334 F.3d at 925 ("A hearing before an immigration judge, therefore, could not help [petitioner] because . . . [s]ection 1231(a)(5) provides that an alien who meets those criteria flatly 'is not eligible' for other relief.").

[14] We are satisfied, moreover, that the regulation provides sufficient procedural safeguards to withstand a facial challenge for patent procedural insufficiency. Given the narrow and mechanical determinations immigration officers must make and the procedural safeguards provided by 8 C.F.R. § 241.8, *see* pp. 1426-28 *supra*, the risk of erroneous deprivation is extremely low. DHS estimates that immigration officers have issued approximately 211,000 reinstatement orders nationwide since 1999, and the amici identify only three such cases that have been reversed on grounds other than retroactivity.[16] Because the risk of error is so low, any additional or sub-

---

[15]Morales' wife filed an I-130 alien relative petition, concurrently with Morales' I-485 application to adjust status, in March 2001. Morales, however, was unlawfully present in the United States for more than a year before removal and then reentered illegally. Consequently, he is inadmissible for ten years since his last departure from the United States. *See* INA § 212(a)(9)(C), 8 U.S.C. § 1182(a)(9)(C).

As an inadmissible alien seeking adjustment of status, he needed to file an I-212 petition for a discretionary waiver before he could apply for reentry. INA § 245(i), 8 U.S.C. § 1255(i); 8 C.F.R. § 212.2(e). He didn't do so before the prior removal order was reinstated, so he "is not eligible and may not apply for any relief." INA § 241(a)(5), 8 U.S.C. § 1231(a)(5); *Padilla*, 334 F.3d at 925 (holding that reinstatement bars all relief, including relief under INA § 245(i)); *cf. Perez-Gonzalez* v. *Ashcroft*, 379 F.3d 783, 788 (9th Cir. 2004) ("Given the fact that Perez-Gonzalez applied for the waiver *before* his deportation order was reinstated, he was not yet subject to its terms and, therefore, was not barred from applying for relief.").

[16]The Supreme Court held that the reinstatement provision has no impermissible retroactive effect in *Fernandez-Vargas*, 126 S. Ct. at 2434, so the officers did not err in reinstating pre-1996 removal orders.

stitute procedural safeguards—including those Morales seeks —would produce marginal protections, if any, against erroneous determinations, while the cost in terms of resources and delay would be substantial. Due process does not require such a poor bargain. *See Mathews* v. *Eldridge*, 424 U.S. 319, 335 (1976).

While the regulation does not offend due process, we leave open the possibility that individual petitioners may raise procedural defects in their particular cases. Morales himself raises several such challenges, and to these we now turn.

**[15] B.** Morales first claims he had no meaningful opportunity to review his file and respond to adverse evidence. But Morales points to no material errors in his file; nor does he explain what evidence he would have presented, had he been given an opportunity to do so. 8 C.F.R. § 241.8(b) requires immigration officers to provide notice, and permits the alien to make a written or oral statement to be considered by the officer under 8 C.F.R. § 241.8(a)(3). Morales was given the benefit of these procedures, and he has failed to show how a more elaborate process would have helped him.

**[16]** Second, he argues he should have had an opportunity to obtain assistance of counsel, but there is no Sixth Amendment right to counsel in any civil removal proceeding. *Lara-Torres* v. *Ashcroft*, 383 F.3d 968, 974 (9th Cir. 2004). Any such right is statutory, and the INA extends the right to representation by counsel only to aliens in proceedings before an immigration judge. Similarly, the Administrative Procedure Act provides a right to counsel "in every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing." 5 U.S.C. § 554(a). The INA does not require a hearing here. In any event, Morales cannot show prejudice: He does not contest the predicates for reinstatement, and was not eligible for any type of relief. Having a lawyer would not have changed the outcome.

**[17]** Morales' third argument, that the immigration officer who reinstated his removal order suffered from institutional bias, is foreclosed by *Marcello* v. *Bonds*, 349 U.S. 302 (1955): "Th[is] contention [of bias] is without substance when considered against the long-standing practice in deportation proceedings, judicially approved in numerous decisions in the federal courts, and against the special considerations applicable to deportation which the Congress may take into account in exercising its particularly broad discretion in immigration matters." *Id.* at 311; *see also United States* v. *Garcia-Martinez*, 228 F.3d 956, 960-63 (9th Cir. 2000).

**[18]** Finally, Morales argues that he was denied due process because he was not notified of the availability of judicial review. We have never required such notice in the civil immigration context, and we find no reason to require it in the reinstatement context—where an alien's rights and remedies are severely limited. *See* Part III.C *infra*. In any event, petitioner obviously got notice because he "filed a timely petition for judicial review to this court. Again, no prejudice has been shown." *Ochoa-Carrillo*, 437 F.3d at 848.

**C.** Morales also claims that a removal order may not constitutionally be reinstated if the underlying removal proceeding itself violated due process. We have, on several occasions, expressed "serious[ ] doubt that the government's new reinstatement procedure comports with the Due Process Clause." *Castro-Cortez* v. *INS*, 239 F.3d 1037, 1040 (9th Cir. 2001), *abrogated by Fernandez-Vargas*, 126 S. Ct. at 2427 & n.5.**[17]**

---

**[17]***See also Perez-Gonzalez*, 379 F.3d at 796 (addressing the harm "on narrower grounds than due process"); *Padilla*, 334 F.3d at 924 ("[W]e still need not decide whether the INS's regulation offends due process . . . ."). *But see United States* v. *Luna-Madellaga*, 315 F.3d 1224, 1226-27 (9th Cir. 2003) ("[A]n alien who illegally reenters the United States while under an order of removal has already received a full and fair hearing . . . ."); *Alvarenga-Villalobos* v. *Ashcroft*, 271 F.3d 1169, 1173, 1174 (9th Cir. 2001) ("[A]liens removable under § 241(a)(5) have already received all of the process that is due under the Constitution." "To preclude a second bite at the apple after an illegal reentry does not offend due process.").

And, one of our cases lends direct support to Morales' contention: "[T]he INS cannot reinstate a prior order of removal that did not comport with due process." *Arreola-Arreola* v. *Ashcroft*, 383 F.3d 956, 963 (9th Cir. 2004).

**[19]** To the extent we so held in *Arreola-Arreola*, we revisit that decision here and reverse field: Reinstatement of a prior removal order—regardless of the process afforded in the underlying order—does not offend due process because reinstatement of a prior order does not change the alien's rights or remedies. The *only* effect of the reinstatement order is to cause Morales' removal, thus denying him any benefits from his latest violation of U.S. law, committed when he reentered the United States without the Attorney General's permission in contravention of INA § 212(a)(9), 8 U.S.C. § 1182(a)(9). The reinstatement order imposes no civil or criminal penalties, creates no new obstacles to attacking the validity of the removal order, *see, e.g.*, INA § 240(b)(5)(C)(ii), 8 U.S.C. § 1229a(b)(5)(C)(ii) (allowing reopening of a removal order based on lack of notice), and does not diminish petitioner's access to whatever path for lawful entry into the United States might otherwise be available to him under the immigration laws.

In short, reinstatement of the removal order leaves Morales in the same position as on the date of the original removal. The Supreme Court noted this very point in *Fernandez-Vargas*:

> While the [reinstatement] law looks back to a past act in its application to "an alien [who] has reentered . . . illegally," 8 U.S.C. § 1231(a)(5), the provision does not penalize an alien for reentry (criminal and civil penalties do that); it establishes a process to remove him "under the prior order at any time after the reentry." *Ibid.* . . . [T]he statute applies to stop an indefinitely continuing violation that the alien him-

self could end at any time by voluntarily leaving the country.

126 S. Ct. at 2432 (second alteration in original). While aliens have a right to fair procedures, they have no constitutional right to force the government to re-adjudicate a final removal order by unlawfully reentering the country. Nor is the government required to expend vast resources on extraneous procedures before reinstating a removal order that has already been finalized and executed.

Or, to put it differently, an alien who respects our laws and remains abroad after he has been removed should have no fewer opportunities to challenge his removal order than one who unlawfully reenters the country despite our government's concerted efforts to keep him out. If Morales has a legitimate basis for challenging his prior removal order, he will be able to pursue it after he leaves the country, just like every other alien in his position. If he has no such basis, nothing in the Due Process Clause gives him the right to manufacture for himself a new opportunity to raise such a challenge. The contrary conclusion would create a new and wholly unwarranted incentive for aliens who have previously been removed to reenter the country illegally in order to take advantage of this self-help remedy. It would also make a mockery of aliens who do respect our laws and wait patiently outside our borders seeking lawful admission. Nothing in the Constitution requires such a perverse result.

## IV

**[20]** We conclude that a previously removed alien who reenters the country illegally is not entitled to a hearing before an immigration judge to determine whether to reinstate a prior removal order. The reinstatement statute and its implementing regulation comport with due process, and 8 C.F.R. § 241.8 is a valid interpretation of the INA.

**[21]** Morales has shown no violation of due process in the conduct of his reinstatement proceeding. To the extent genuine issues of material fact exist with respect to his underlying removal order, this "prior order . . . is not subject to being reopened or reviewed" during the course of the reinstatement process. INA § 241(a)(5), 8 U.S.C. § 1231(a)(5).

**PETITION DENIED.**

---

THOMAS, Circuit Judge, with whom PREGERSON, REINHARDT, and W. FLETCHER, Circuit Judges, join, dissenting:

On January 15, 2003, Raul Morales-Izquierdo and his United States citizen wife, Patricia Morales, attended a meeting at the INS's Tacoma, Washington office. The Moraleses expected to discuss the I-130 alien relative petition that Patricia had filed on March 1, 2001, to adjust her husband's status to that of a legal permanent resident. Instead, the INS served on the couple both a denial of the petition for adjustment of status and a notice of intent to reinstate a 1994 deportation order against Raul Morales under INA § 241(a)(5).

Morales has consistently and emphatically maintained that the 1994 deportation order is invalid because he was never given notice of the 1994 hearing at which he was ordered deported *in absentia*. In a sworn statement, Morales claimed never to have received the notice that was sent to his ex-girlfriend's house, explaining that someone else had signed to indicate receipt of the notice. He has never been granted a hearing at which he could present his case; the majority opinion assures that he never will be.

This result would have been impossible under the regulations that governed reinstatement proceedings for nearly forty-five years. Under the former 8 C.F.R. § 242.23, an alien

subject to a reinstatement order was entitled to a hearing before an immigration judge, who was charged with determining the identity of the alien, whether the alien had previously been deported, and whether the alien illegally reentered the United States. 8 C.F.R. § 242.23 (repealed 1997). At the hearing before the immigration judge, the alien had the opportunity to contest the charges and evidence, present his or her own evidence, and apply for relief from deportation. *Id.* The alien was also afforded the right to appeal an adverse decision to the Board of Immigration Appeals and ultimately to the federal courts of appeal. *Castro-Cortez v. INS*, 239 F.3d 1037, 1044 (9th Cir. 2001).

All of that changed in 1997, when the Attorney General made a complete course reversal. Under the new regulation, aliens were to be removed from the country without a hearing or an opportunity to contest the charges, via reinstatement by a low-level Department of Homeland Security employee who served as both prosecutor and judge.

The central question in this case is whether the Immigration and Naturalization Act ("INA") permits the Attorney General to make these changes, eliminating longstanding procedural protections. Because the INA unambiguously prohibits the Attorney General from creating alternative procedures for any inadmissibility or deportability determinations absent explicit congressional permission and because the creation of less-protective procedural mechanisms raises serious constitutional questions, I respectfully dissent from the majority's decision to uphold the Attorney General's regulation.[1]

I

As the majority and I agree, the appropriate framework for

---

[1]Because I conclude that the regulation is *ultra vires* to the statute, I find it unnecessary to reach the question of whether the regulation violates the Due Process Clause.

assessing the validity of 8 C.F.R. § 241.8 is dictated by *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-45 (1984). Under *Chevron*, we must consider first "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. "If Congress has done so, the inquiry is at an end; the court 'must give effect to the unambiguously expressed intent of Congress.' " *Food and Drug Administration v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) (quoting *Chevron*, 467 U.S. at 843).

In determining congressional intent, we not only examine the precise statutory section in question but also analyze the provision in the context of the governing statute as a whole, presuming a congressional intent to create a "symmetrical and coherent regulatory scheme." *Id.* at 1301 (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569 (1995)). We must also "be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of [significant] economic and political magnitude to an administrative agency." *Id.* If, after conducting such an analysis, we conclude that Congress has not addressed the issue, we "must respect the agency's construction of the statute so long as it is permissible." *Id.* at 1300 (citing *INS v. Aguirre-Aguirre*, 526 U.S. 415, 424 (1999)).

Ultimately, "the judiciary is the final authority" in interpreting statutes, and courts must employ all "traditional tools of statutory construction" under *Chevron* step one to ascertain whether Congress's intent is "clear." *Chevron*, 467 U.S. at 843 n.9. In this case, the text and structure of the INA are clear; the statute unambiguously prohibits the Attorney General's interpretation. But even if the statute were ambiguous, the Attorney General's interpretation would be precluded by the canon of constitutional avoidance — unquestionably a "traditional tool of statutory construction" to be used at *Chevron* step one — pursuant to which we must presume that Congress did not intend to permit any interpretation that, like the Attorney General's, raises serious constitutional questions.

## II

The intent of Congress could hardly be clearer. The text and structure of the INA unambiguously require that inadmissibility and deportability determinations be made by an immigration judge pursuant to the procedural protections outlined in INA § 240. Section 240 declares that the procedural mechanism it creates "shall be the sole and exclusive procedure for determining" an alien's removability, unless Congress has "specified" an alternative procedure. INA § 240(a)(3); 8 U.S.C. § 1229(a)(3). This language leaves no room for quarreling. Unless Congress explicitly creates a new procedural mechanism, the § 240 procedure must be followed in any and all "removal proceedings." INA § 240(a)(1); 8 U.S.C. § 1229(a)(1). Because reinstatement proceedings determine the admissibility of aliens and because the reinstatement provision contains no explicit procedural exception, it is clear that § 241(a)(5) proceedings must employ the required § 240 mechanism.

Although the statute's plain language should settle the question, it is worth noting that this construction is buttressed by the INA's inclusion of several provisions that *do* explicitly create or authorize alternative procedural mechanisms, demonstrating that Congress knew how to express an intention to deviate from § 240 and failed to do so in § 241(a)(5). *See, e.g.*, INA § 235(b)(1) (expedited removal for arriving and certain other aliens); INA § 235(c) (expedited removal for terrorists); INA § 238 (administrative removal for nonpermanent residents convicted of an aggravated felony). The existence of these explicit provisions has considerable significance in discerning Congress's intent. *See Valderrama-Fonseca v. INS*, 116 F.3d 853, 856 & n. 6 (9th Cir.1997) (noting in relation to IIRIRA § 348 that "it is apparent that Congress knew how to make provisions of IIRIRA applicable to pending proceedings when it wanted to").

In short, § 240 requires an explicit exemption before expedited procedures may be used, and § 241(a)(5) contains no

such exemption. Thus, because 8 C.F.R. § 241.8 goes beyond the authority of the INA by eliminating the express and exclusive authority of immigration judges to determine whether an alien's prior deportation order should be reinstated under INA § 241(a)(5), the regulation is *ultra vires* to INA § 240(a). *See Romero v. INS*, 39 F.3d 977, 979-81 (9th Cir. 1994).

Despite these unambiguous statutory requirements, the majority concludes that reinstatement proceedings need not follow § 240 strictures. The majority holds that the reinstatement provision authorizes the Attorney General's less-protective procedural mechanism just by implying a preference for shorter proceedings. But this analysis violates the very statute it purports to interpret. The INA does not tolerate implied authorizations; it requires Congress to "specify" an intention to deviate from § 240 guarantees. INA § 240(a)(3) ("*Unless otherwise specified in this Act*, a proceeding under this section shall be the sole and exclusive procedure" for removal.) (emphasis added).

The majority, of course, does not rest entirely on its assertion of implied repeal; it also argues that reinstatement proceedings are not "removal proceedings" and that they therefore do not fall within the ambit of § 240. However, reading the reinstatement provision both on its face and in its context, "with a view to [its] place in the overall statutory scheme," *Davis v. Michigan Dept. of Treasury*, 489 U.S. 803, 809 (1989), it is evident that § 241(a)(5) is not an alternative to § 240; rather, a § 241(a)(5) reinstatement order may issue only after a § 240 determination has been made that the alien is removable. The reinstatement provision does nothing to change the fact that illegally reentering aliens fall squarely within the category of "removable" aliens entitled to § 240 procedural guarantees. Section 240(e)(2) defines "removable" aliens as all those that are "inadmissible under section 212" or "deportable under section 237." One of the enumerated grounds for inadmissibility under § 212 is illegal reentry; it covers aliens who have "been ordered removed" and have

"enter[ed] or attempt[ed] to reenter the United States without being admitted."[2] INA § 212(a)(9)(C)(i); 8 U.S.C. § 1182(a)(9)(C)(i). By enumerating illegal reentry as a ground for inadmissibility and by specifying that all inadmissible aliens are "removable" within the meaning of § 240, the INA expressly provides for the removal of illegally reentering aliens pursuant to ordinary § 240 procedures.

Importantly, § 212(a)(9)(C)(i) also specifically anticipates reentry after a formal removal order, meaning that the provision covers exactly the same group of aliens that the reinstatement provision covers. It is therefore simply not true that "reinstateable" aliens constitute a separate category from "removable" aliens. The so-called "first-instance" removal provisions, namely §§ 240 and 212, expressly cover the same aliens that the reinstatement provision covers.

This dual coverage need not render either provision surplusage nor need it imply that an alien subject to reinstatement is entitled to precisely the same rights as an alien facing removal for the first time. As many courts have made clear, the reinstatement provision strips illegally reentering aliens of discrete rights that are granted to first time removable aliens, including the rights to "relief, reopening, [and] review." *De Sandoval v. U.S. Att'y Gen.*, 440 F.3d 1276, 1281 (11th Cir. 2006). The majority is also correct to note that § 241(a)(5) narrows the substantive inquiry that must be made prior to determining the alien's status. Additionally, the reinstatement provision creates a new kind of order to be entered at the end of a § 240 proceeding: an immediately-executing reinstate-

---

[2]Illegally reentering aliens are also "deportable" under INA § 237(a)(1); 8 U.S.C. § 1226a(a)(1), which includes aliens that were "inadmissible" at the time of entry and those that are "present in the United States in violation of" the INA. Under § 212(a)(9), all reentering aliens are "inadmissible," and under INA § 276; 8 U.S.C. § 1326(a), which makes it a crime to reenter the United States after receiving a formal order of deportation, exclusion, or removal, all reentering aliens are "present in the United States in violation of" the INA.

ment order. The reinstatement provision, therefore, has real effects on the rights of reentering aliens and on the consequences of a reinstatement determination. But it does not — and cannot be read to — authorize abrogation of the procedural guarantees mandated by § 240. The rights-stripping provisions in § 241(a)(5) do not conflict with any § 240 procedures; the reinstatement provision can be given full effect without undermining § 240 exclusivity.

In short, the only way to give effect to both §§ 240 and 241(a)(5), especially taking into consideration the express inclusion of reentering aliens in the category of "removable" aliens, is to require that a reinstatement order issue only after a full § 240 hearing before an immigration judge. *See Bowsher v. Merck & Co., Inc.*, 460 U.S. 824, 833 (1983) (restating and reaffirming "the settled principle of statutory construction that we must give effect, if possible, to every word of the statute"); *FTC v. Mandel Brothers, Inc.*, 359 U.S. 385, 389 (1959) (holding that statutes should be interpreted so as to "fit, if possible, all parts into an harmonious whole").

The majority finds additional justification for reading § 241(a)(5) as authorizing a deviation from § 240 requirements in the fact that the reinstatement provision mentions the Attorney General rather than immigration judges, allegedly indicating a differential delegation of discretion. However, the Attorney General is merely a titular decision-maker, an example of statutory synecdoche, using the head of the Department of Justice to refer to all of its employees. Countless provisions of the INA refer to determinations of "the Attorney General" even when those determinations will actually be made by lower-level employees and even when those determinations *must* actually be made by immigration judges pursuant to § 240 procedures. For example, the statutory provision outlining grounds of inadmissibility, INA § 212, contains several references to findings of the Attorney General even though § 240 unquestionably requires that immigration judges make inadmissibility determinations. *See, e.g.*, INA § 212(a)(2)(C)

(deeming inadmissible any alien whom "the Attorney General knows or has reason to believe" is a drug trafficker or a drug trafficker's spouse); INA § 212(a)(2)(H)(i) (any alien whom "the Attorney General knows or has reason to believe" is a human trafficker); § 212(a)(2)(I) (any alien whom "the Attorney General knows, or has reason to believe" is a money launderer); § 212(a)(3)(A) (any alien whom "the Attorney General knows, or has reasonable ground to believe, seeks to enter the United States" as a spy); § 212(a)(3)(B)(i)(II) (any alien whom "the Attorney General . . . knows, or has reasonable ground to believe" is an active terrorist); § 212(a)(4)(A) (any alien who "in the opinion of the Attorney General at the time of application for admission or adjustment of status" is likely to become a "public charge"). These provisions might authorize the Attorney General to promulgate regulations clarifying the burden of proof or the evidence that is admissible, but they certainly do not affect the § 240 requirement that inadmissibility determinations be made by immigration judges.

The majority additionally claims that the mention of immigration judges in § 240 "suggests Congress knew how to mandate a hearing before an immigration judge, but chose not to do so in the context of reinstatement orders." Maj. Op. at 1401 (quoting *De Sandoval*, 440 F.3d at 1281). This argument begs the question. The point is that Congress did not believe itself to be mandating or authorizing any kind of hearing whatsoever; section 241(a)(5) is a substantive provision that leaves § 240 hearing requirements entirely intact.

Although the majority is right to assert that § 241(a)(5) indicates a desire to shorten proceedings for illegally reentering aliens, it is wrong to conclude that the reinstatement provision authorizes a deviation from § 240 procedural guarantees. Section 241(a)(5) streamlines reinstatement proceedings by stripping reentering aliens of a discrete set of rights, not by authorizing an expedited procedural mechanism. Considering the text of the reinstatement provision and its context in the statutory scheme, it is clear that § 241(a)(5)

authorizes reinstatement orders to issue only after an immigration judge makes a § 240 determination that the alien is "removable."

In sum, Congress has expressed its unambiguous intent that the procedural mechanisms it created in § 240 "shall be the sole and exclusive procedure for determining" an alien's removability. Because the Attorney General's regulation establishes procedures that conflict with the express provisions of the INA, it cannot stand. *See Bona v. Gonzales*, 425 F.3d 663, 670-71 (9th Cir. 2005) (holding that a regulation that is contrary to statute is invalid).

## III

Even if the text and structure of the INA were sufficiently ambiguous to leave some discretion to the Attorney General, the canon of constitutional avoidance would preclude the interpretation that the Attorney General chose.

## A

The avoidance canon instructs courts to reject those "plausible statutory constructions" that "would raise a multitude of constitutional problems," *Clark v. Martinez*, 543 U.S. 371, 380-81 (2005), as long as an alternative construction exists that is "fairly possible" and less troubling, *Crowell v. Benson*, 285 U.S. 22, 62 (1932). The canon rests not only on courts' desire "to avoid the decision of constitutional questions" but also on a "reasonable presumption that Congress did not intend the alternative which raises constitutional doubts." *Clark*, 543 U.S. at 381. Avoidance, then, is a "means of giving effect to congressional intent," *id.* at 381-82, resting on an assumption that, between two plausible statutory constructions, Congress meant the one that does not approach the boundaries of "constitutionally protected liberties," *DeBartolo*, 485 U.S. at 575. In short, the avoidance canon rests on

a judicial presumption that Congress always intends to steer clear of constitutional boundaries.

For purposes of this case, two important conclusions flow from the avoidance canon's rationales: first, the canon is highly relevant at *Chevron* step one, and second, the canon does not ultimately depend on the merits of implicated constitutional claims.

Because the avoidance canon centers on a presumption about congressional intent, it certainly pertains to the step one determination of whether Congress intended to preclude the agency's interpretation. *See Brown & Williamson*, 529 U.S. at 126 (denying deference at step one, not because the statute was entirely clear, but because "Congress ha[d] clearly precluded" the agency's construction); *MCI Telecommunications Corp. v. American Telephone & Telegraph Co.*, 512 U.S. 218, 229 (1994) (holding that an agency's interpretation should be denied deference at step one, even in the face of some ambiguity, if the proffered interpretation "goes beyond the meaning that the statute can bear"); *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 574 (1988) (holding that an interpretation should be denied deference at step one if it is "clearly contrary to the intent of Congress"); *INS v. Cardoza-Fonseca*, 480 U.S. 421, 448 n.31 (1987) (denying deference at step one even while noting that the provision contained significant ambiguities, on the ground that the statute clearly precluded the agency's interpretation).

The avoidance canon, thus, is properly applied at step one of the *Chevron* analysis. While the majority may be correct that the avoidance canon cannot be used to render an agency's interpretation "unreasonable" at *Chevron* step two, the canon is unquestionably a "traditional tool of statutory interpretation" that may and should be used to determine whether Congress intended to preclude the agency's chosen interpretation. *See, e.g., Solid Waste Agency of N. Cook County v. U.S. Army*

*Corps of Eng'rs*, 531 U.S. 159, 172-73 (2001) (denying deference because the agency's interpretation "needlessly" raised serious "constitutional issues" and because the Court assumed "that Congress does not casually authorize administrative agencies to interpret a statute to push the limit of congressional authority"); *DeBartolo*, 485 U.S. at 575 (rejecting an agency's interpretation at step one because it raised "serious constitutional problems"). *See also Lattab v. Ashcroft*, 384 F.3d 8, 20n.5 (1st Cir. 2004) (specifically reserving the question of whether "the rule of avoidance" would "lead to a different statutory construction" if it were applied "under the first step of *Chevron*").

The second conclusion to flow from the avoidance canon's rationales is that its application does not depend on this or any court's conclusions as to the merits of implicated constitutional claims. *Clark*, 543 U.S. at 381 ("The canon is not a method of adjudicating constitutional questions by other means.") (*citing* Adrian Vermeule, *Saving Constructions*, 85 Geo. L.J. 1945, 1960-61 (1997) (listing cases in which the Supreme Court used the canon to avoid a constitutional question only later to decide that the avoided application was not unconstitutional)). Even if every constitutional challenge to arise under the Attorney General's regulation were ultimately decided against the alien, the regulation should be rejected under the avoidance canon if it approaches "the constitutional danger zone" without a clear statement from Congress that it intended to do so. Vermeule, 85 Geo. L.J. at 1960.

B

That the reinstatement regulation does, in fact, approach the "constitutional danger zone" is beyond cavil. We have noted specifically on more than one occasion that 8 C.F.R. § 241.8 "raises very serious due process concerns[.]" *Castro-Cortez v. INS*, 239 F.3d 1037, 1048 (9th Cir. 2001), *abrogated on other grounds by Fernandez-Vargas v. Gonzales*, 126 S.Ct. 2422, 2427 & n.5 (2006). *See also Aguilar-Garcia v. Ridge*, 90

Fed.Appx. 220, 220 (9th Cir. 2004); *Arreola-Arreola v. Ashcroft*, 383 F.3d 956, 959 (9th Cir. 2004).

And several of our sister circuits have expressed similar doubts as to the sufficiency of process afforded. *See Lattab*, 384 F.3d at 21 n.6 (noting the seriousness of the constitutional claim given that the regulation "offers virtually no procedural protections"); *United States v. Charleswell*, 456 F.3d 347, 356 n.10 (3d Cir. 2006) (noting that constitutional doubts relating to the regulation "continue to cause a significant amount of consternation"); *Bejjani v. INS*, 271 F.3d 670, 687 (6th Cir. 2002) (construing the regulation as having no retroactive effect in part "to avoid a constitutional question"), *abrogated on other grounds by Fernandez-Vargas*, 126 S.Ct. at 2427 & n.5; *Gomez-Chavez v. Perryman*, 308 F.3d 796, 802 (7th Cir. 2002) (reserving the question of "what kind of procedures" would be "necessary" for an alien who challenges the factual basis for reinstatement); *Alvarez-Portillo v. Ashcroft*, 280 F.3d 858, 867 (8th Cir. 2002) (noting that additional procedures might be due for an alien who challenges the applicability of reinstatement), *abrogated on other grounds by Fernandez-Vargas*, 126 S.Ct. at 2427 & n.5.

When we examine the reinstatement procedures more closely, the constitutional concerns expressed by our court and others become apparent. It is well-settled that the due process clause of the Fifth Amendment applies to aliens in removal proceedings. *Arreola*, 383 F.3d at 962; *United States v. Nicholas-Armenta*, 763 F.2d 1089, 1090 (9th Cir. 1985). Due process requires "a full and fair hearing of [the alien's] claims and a reasonable opportunity to present evidence on his behalf," *Salgado-Diaz v. Ashcroft*, 395 F.3d 1158, 1162 (9th Cir. 2005) (internal quotation marks omitted). Here, both on a facial and as-applied examination, the reinstatement process is well within the constitutional danger zone.

## 1

First, purely on a facial analysis, the reinstatement process itself approaches the "constitutional danger zone" because it

does not provide any opportunity for the alien to challenge the legality of a prior removal order. The inquiry is confined to three determinations: (1) the identity of the alien, (2) that the alien has previously been deported, and (3) that the alien illegally reentered the United States. 8 C.F.R. § 241.8. Thus, an alien that previously has been removed *in absentia* and without due process has no means of raising his due process claim.

Even as to the three factual determinations to be made, the Attorney General's reinstatement procedure affords insufficient procedural protections, clearly approaching — if not breaching — the constitutional danger zone. The reinstatement procedure does not provide adequate means to contest the predicates to reinstatement. As we observed in *Castro-Cortez*, "an alien cannot receive a full and fair hearing unless he has the right to place information into the administrative record." 239 F.3d at 1049. Under the regulation, however, the alien is afforded the ability only to make "a written or oral statement contesting the determination" to the officer who has already decided to reinstate the order. 8 C.F.R. § 241.8(a)(3). Thus, if an alien wishes to contest the fact that he was previously deported or that his reentry was illegal, he is not permitted to do so with any extrinsic evidence. Under the reinstatement regulation, the alien has no right to introduce documents or other evidence to be considered by the officer; the officer alone determines what will constitute the administrative record. Furthermore, the alien has no right to a hearing at which he or she could call witnesses to testify, and the alien is not afforded the right to review the immigration file upon which the charges are based or to confront the evidence assembled by the government in support of reinstatement.

The lack of due process in practice is illustrated by the reinstatement cases that have found their way to the courts of appeal. In the typical reinstatement case considered by our circuit and our sister circuits, the alien has married a United States citizen and makes an appointment with the agency to discuss adjustment of status or an extension of a previously

granted work authorization. During the discussion, the officer serves a Notice to Reinstate Prior Order and asks the alien to fill out the form, which includes a checkbox to indicate whether the alien wishes to make a statement. If the box is checked "no," that is the end of the matter, and the reinstatement is effected without further ado. If the box is checked "yes," either the alien writes out a statement, or the officer asks questions and writes down the answers. Then the reinstatement is effected, and the alien usually is immediately taken into custody.[3] This procedure cannot be said to comport

---

[3]*See, e.g., Lino v. Gonzales*, 467 F.3d 1077 (7th Cir. 2006) (alien married to U.S. citizen with three U.S. citizen daughters served with reinstatement notice during interview concerning adjustment of status); *Fernandez-Vargas v. Ashcroft*, 394 F.3d 881, 883 (10th Cir. 2005) (alien married to U.S. citizen served with reinstatement notice during interview concerning adjustment of status and taken into custody); *Berrum-Garcia v. Comfort*, 390 F.3d 1158, 1161(10th Cir. 2004) (alien with U.S. citizen wife served with notice of reinstatement of removal during interview concerning adjustment of status); *Lattab,* 384 F.3d at 12 (alien married to U.S. citizen with adjustment of status proceedings pending served with reinstatement notice during visit to agency office to renew employment authorization and taken into custody); *Perez-Gonzalez v. Ashcroft*, 379 F.3d 783, 785-86 (9th Cir 2004) (alien married to U.S. citizen served with reinstatement notice and taken into custody during interview about petition to reapply for admission as predicate to adjustment of status); *Flores v. Ashcroft*, 354 F.3d 727, 729 (8th Cir. 2003) (alien with U.S. citizen husband served with reinstatement notice and taken into custody during adjustment of status interview); *Padilla v. Ashcroft*, 334 F.3d 921, 923 (9th Cir. 2003) (alien married to U.S. citizen served with reinstatement notice during interview concerning adjustment of status and taken into custody); *Gomez-Chavez v. Perryman*, 308 F.3d 796, 799 (7th Cir. 2002) (alien married to U.S. citizen with work authorization served with notice to reinstate during interview concerning adjustment of status); *Gallo-Alverez v. Ashcroft*, 266 F.3d 1123, 1127 (9th Cir. 2001) (alien married to U.S. citizen returns to INS office at suggestion of District Director to renew work authorization, served with Notice to Reinstate Prior Order and taken into custody); *Castro-Cortez*, 239 F.3d at 1040 (alien [Castro-Cortez] married to U.S. citizen served with reinstatement notice during interview concerning adjustment of status and taken into custody); *Id.* at 1042 (alien [Funes-Quevado] married to a U.S. citizen served with reinstatement notice during interview concerning adjustment of status and taken into custody); *Id.*

with the requirements of notice and a hearing before a person is deprived of liberty. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). The very real and practical consequence of the Attorney General's decision is that families in the United States are broken apart, with the father or mother summarily removed from the country without any opportunity to contest the government's charges.

In short, the regulatory procedure is so streamlined that it deprives reentering aliens of any meaningful opportunity to raise potentially viable legal, constitutional, or factual challenges to their removability. Based on these observations, it is clear that the reinstatement process implemented by 8 C.F.R. § 241.8 falls within the constitutional danger zone.

2

When one specifically examines whether due process has been afforded to Morales in this case, one can only conclude that the procedures as applied to him place him within the constitutional danger zone.

First, the due process problems inherent in the reinstatement process affected Morales. He appeared at his interview for adjustment of status. Without prior notice, he was presented with a Notice of Intent to Reinstate Prior Order. He

---

at 1042-43 (alien [Rueda] married to a U.S. citizen served with reinstatement notice during interview concerning adjustment of status and arrested); *Id.* at 1043 (alien [Salinas-Sandoval] married to U.S. citizen served with reinstatement notice during visit to agency to inquire about progress on adjustment of status request); *see also Wilson v. Gonzales*, 2006 WL 3541717 (2d Cir. 2006) (alien business owner married to U.S. citizen served with reinstatement notice during adjustment of status proceedings); *Faiz-Mohammad v. Ashcroft*, 395 F.3d 799, 801 (7th Cir. 2005) (reinstatement notice served during adjustment of status proceedings); *Arevalo v. Ashcroft*, 344 F.3d 1, 6 (1st Cir. 2003) (alien with U.S. citizen children served with reinstatement order during sixth year of adjustment of status proceedings).

was not afforded a lawyer. Although he stated that he did not read or write English and needed to have things explained in Spanish in words he could understand, he was not afforded an interpreter. According to the agent's notes, Morales stated that he had never been before an immigration judge, that he was never informed that he was deported *in absentia*, and that the signature on the notice card was not his. He was not afforded the opportunity to examine the immigration file that served as the basis for the reinstatement. Rather, despite the fact that he contested the factual predicate for a reinstatement order to issue, he was immediately arrested and taken into custody after he finished answering the officer's questions. Thus, in his case, the facial due process concerns with the reinstatement process were not merely theoretical; he experienced them. He was not given the opportunity to contest the factual basis for the reinstatement, even though he vigorously disputed it. The procedures utilized in Morales' reinstatement hearing place him within the constitutional danger zone.

Second, because he was deported *in absentia*, Morales has never seen an immigration judge at all. He never had a full hearing on his prior deportation charges. Therefore, his situation is different from that involved in *Arreola-Arreola*, in which we concluded that the alien had received due process in his prior deportation hearing.

If Morales' allegations are true — that he never received notice of the deportation hearing at which he was deported *in absentia* — then there can be no question that he has been denied a full and fair hearing of his claims; he was, in fact, denied any hearing at all. *See Colmenar*, 210 F.3d at 971 (holding that an asylum petitioner was denied a full and fair hearing and a reasonable opportunity to present evidence on his behalf where the IJ "acted as a partisan adjudicator" during petitioner's hearing). Thus, the procedures used in the

underlying deportation hearing independently place Morales within the constitutional danger zone.[4]

### 3

Because the reinstatement procedures fall within the constitutional danger zone, both facially and as applied to Morales, the doctrine of constitutional avoidance requires a presumption that Congress intended to afford Morales a full § 240 hearing before an immigration judge. This statutory construction, which is consistent with the plain words of § 240 and with the overall structure of the INA, necessarily means that the reinstatement regulation is *ultra vires* to the statute and must be invalidated.

### C

Rather than reaching the question of whether there has been a deprivation of due process, the majority opinion contends that any such violation can be addressed and remedied by the court on a petition for habeas corpus, filed by the alien following removal. This contention, however, cannot be squared with the Real ID Act of 2005's limitation on the availability of habeas review.[5] In fact, the majority's suggestion highlights

---

[4]It is, of course, unnecessary in avoidance analysis to determine whether Morales has demonstrated prejudice. Because there is at least a serious possibility that the reinstatement regulations violated Morales's due process rights, those regulations are inconsistent with presumed congressional intent regardless of whether Morales has shown a remediable constitutional violation in his case. Nevertheless, it is worth noting that Morales has shown a significant likelihood of prejudice by contesting both the constitutionality of the initial removal order and the factual basis of the reinstatement order. His inability to present and develop those claims before an immigration judge may well have resulted in an erroneous deportation.

[5]The majority opinion does not specify that it has habeas relief in mind, but a writ of habeas corpus is the only imaginable remedy that an alien could seek after removal from the country. By the time that a removal order has been executed, motions to reopen and petitions for review would

a second "constitutional danger zone" that the reinstatement provision approaches: the Suspension Clause.

Section 106(a) of the Real ID Act, Pub. L. No. 109-13 (May 11, 2005), amending 8 U.S.C. § 1252(D)(5), provides:

> Notwithstanding any other provision of law, . . . or any other habeas corpus provision, . . . a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of [the INA].

"The [Real ID Act] eliminated habeas jurisdiction . . . over final orders of deportation, exclusion, or removal." *Alvarez-Barajas v. Gonzales*, 418 F.3d 1050, 1052 (9th Cir. 2005). Without § 240 procedural protections during the reinstatement proceeding, this lack of post-removal habeas review raises serious Suspension Clause concerns. The Attorney General's regulation, thus, approaches a second and independent "constitutional danger zone" by denying reinstateable aliens *any* constitutionally sufficient access to relief from detention and deportation.

When there are essential disputed factual issues, the only constitutionally adequate remedy is a "full and fair hearing," which includes "a reasonable opportunity [for the alien] to present evidence on his behalf." *Ibarra-Flores v. Gonzales*, 439 F.3d 614, 620 (9th Cir. 2006) (internal quotation marks omitted). Because the Real ID Act vests exclusive habeas cor-

---

no longer be available. Furthermore, neither a motion to reopen nor a petition for review would allow litigation of a fact-based (or as-applied) substantive constitutional challenge since the agency may not litigate such challenges and the appellate courts may not conduct evidentiary hearings. A removed alien, thus, has absolutely no means of raising an as-applied constitutional challenge to his deportation, particularly after REAL-ID.

pus jurisdiction over final orders of removal in the courts of appeal, the statute necessarily deprives the alien of a contested evidentiary hearing with a resolution that is later subject to appellate review based on a complete record. Courts of appeal are not trial courts. *Tippitt v. Reliance Standard Life Ins. Co.*, 457 F.3d 1227, 1237 (11th Cir. 2006) ("[I]t is not the role of appellate courts to make findings of fact."); *see also Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986) (noting that it was improper for a court of appeals to make "factual findings on its own"). In short, under the Real ID Act, evidentiary hearings in habeas corpus review of final orders of removal are eliminated. Thus, without a hearing before an IJ, Morales will have no opportunity to litigate the contested questions of fact. Even if habeas review were afforded in the appellate courts, it would not be constitutionally sufficient because it would not include an evidentiary hearing at which Morales could participate.

In addition, even if a full post-removal evidentiary hearing were permitted, Morales would be unable to attend and present live testimony without committing the criminal act of reentering the United States after removal, in violation 8 U.S.C. § 1326(a).

In short, the theoretical existence of a post-removal habeas corpus remedy does not provide an opportunity for a full and fair hearing of Morales's claims before a neutral fact-finder. Morales will never have a hearing on his claims. The only method of avoiding this constitutionally problematic result is to enforce the proper construction of the statute, requiring that reinstatement proceedings be governed by § 240 procedures.

D

Given all of these considerations, even if the statutory language were susceptible to another interpretation, the canon of constitutional avoidance would require us to construe the statute to avoid these many constitutional concerns, interpreting

it instead as requiring that § 240 procedures be applicable to reinstatement proceedings. That construction is at least "fairly possible," *Crowell*, 285 U.S. at 62, even if not textually and structurally required, and that construction would avoid the plethora of due process and Suspension Clause problems that are inherent in the Attorney General's regulation.

IV

Congress could hardly have been more clear. The INA unambiguously requires that inadmissibility and deportability determinations be made by an immigration judge pursuant to the procedural protections outlined in INA § 240. Lest there be any doubt, application of the traditional rules of statutory construction, including the canon of constitutional avoidance, dictate the same conclusion; we should not lightly assume that Congress intended to authorize the Attorney General's abrogation of so many aliens' procedural rights. The Attorney General's action in stripping away the procedural protections that had been in place for nearly forty-five years is in direct conflict with the statute and cannot stand.

For those reasons, I respectfully dissent.